1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JON CHRIST,

11              Plaintiff,                    No. 2:10-cv-1786 LKK KJN P

12         vs.

13   S. DEBERRY, et al.,

14              Defendants.            <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16              Plaintiff Jon Christ is a state prisoner, currently incarcerated at San Quentin State

17   Prison.  Plaintiff proceeds without counsel and in forma pauperis in this civil rights action filed

18   pursuant to 42 U.S.C. § 1983.  This case proceeds on plaintiff's original verified complaint (Dkt.

19   No. 1 at 5-13), against one defendant, Correctional Officer S. Deberry-Thornton.  Pending is

20   defendant's motion for summary judgment.  For the reasons that follow, this court recommends

21   that defendant's motion be granted in its entirety.

22   I.  <u>Pertinent Filings</u>

23              Defendant's motion for summary judgment (Dkt. No. 40) was filed in tandem

24   with several supporting declarations (Dkt. Nos. 41-44).  Plaintiff timely filed an opposition, and

25   declared under penalty of perjury the truth of additional facts alleged therein (Dkt. No. 49);

26   defendant filed a reply (Dkt. No. 51).  Plaintiff thereafter filed a surreply (Dkt. No. 53), and a

1   motion for the court to accept as evidence the sworn answers to interrogatories provided by

2   plaintiff's witness, Mr. Pappas (Dkt. No. 52); the court granted plaintiff's motion (Dkt. No. 55).

3   Thereafter, in light of the Ninth Circuit's holding in Woods v. Carey, 684 F.3d 934 (9th Cir.

4   2012) (mandating that pro se plaintiffs be provided notice of the requirements for opposing a

5   motion for summary judgment, contemporaneous with the filing of the motion, as set forth in

6   Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999),

7   and Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988), the court accorded plaintiff

8   additional time to file a new or supplemental opposition to defendant's motion.  (Dkt. No. 55.)

9   On August 6, 2012, plaintiff filed a supplemental opposition.  (Dkt. No. 57.)  Defendant

10  thereafter filed a notice that he would rely on his previously-filed reply (Dkt. No. 58), to which

11  plaintiff objected (Dkt. No. 59).

12          Plaintiff objects to "Defendant's Notice of Intent To Rely on Previously-Filed

13  Reply," on the ground that the Deputy Attorney General who signed the notice (Danielle F.

14  O'Bannon) is not the same Deputy Attorney General who signed the reply (Trace. O. Maiorino).

15  Plaintiff notes that this purported change in representation was accomplished without first

16  obtaining leave of court, which plaintiff asserts was required.

17          The Local Rules provide in pertinent part:

18          When an attorney is employed or retained by a . . .  public entity,
            agency, or department . . . the attorney may participate in an action,
19          without filing a substitution of attorneys, if another person
            employed or retained by the same law firm, organization, public
20          entity, agency, or department is attorney of record in the action.

21  Local Rule 182(b).  In the present action, both O'Bannon and Maiorino are attorneys working for

22  the California Attorney General's Office, and both remain attorneys of record in this case.  Thus,

23  pursuant to Local Rule 182(b), Ms. O'Bannon did not require leave of court to sign the Notice

24  filed August 16, 2012.  Accordingly, plaintiff's objections (Dkt. No. 59) to defendant's "Notice"

25  (Dkt. No. 58) are overruled.

26  ////

1   In an abundance of caution, and notwithstanding the court's prior admonitions

2   (Dkt. No. 55 at 3), the court has construed all of plaintiff's other filings, after defendant filed his

3   motion for summary judgment, as plaintiff's complete opposition to defendant's motion.  Due to

4   plaintiff's pro se status, and the fact that each of the noted filings contains unique information or

5   argument, the court has carefully reviewed each of plaintiff's arguments and all of his evidence

6   in opposition to defendant's motion for summary judgment.  These filings include plaintiff's

7   original opposition (Dkt. No. 49); plaintiff's surreply (Dkt. No. 53);[1] the sworn answers to

8   interrogatories provided by plaintiff's witness, Mr. Pappas (Dkt. No. 52); and plaintiff's

9   supplemental opposition (Dkt. No. 57).  In addition, the court has considered the allegations of

10  plaintiff's verified complaint.  (Dkt. No. 1 at 5-13.)

11  II.  The Complaint

12  Plaintiff originally filed this action in the Santa Clara County Superior Court on

13  March 5, 2010.  Sole defendant Deberry-Thornton (hereafter "defendant" or "Deberry"), through

14  counsel, removed this action to federal court on June 9, 2010.  The case was transferred to this

15  district court in July 2010.

16  The complaint alleges that defendant confiscated, and refused to return, plaintiff's

17  two medical pillows that had been issued to him by Queen of the Valley Hospital following

18  plaintiff's cervical spine surgery.  Plaintiff alleges that, without the pillows, he suffered loss of

19  sleep, increased pain, and long-term injury.  Plaintiff alleges that he was compelled to seek the

20  return of his pillows by seeking medical authorizations, filing requests for disability

21  accommodation, and through the appeals process.  One pillow was re-issued 21 days after its

22  confiscation; the second pillow was re-issued after 69 days.  The complaint alleges First and

23  Eighth Amendment claims pursuant to the Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"),

24

25   [1]  Although the Local Rules do not provide for a surreply, see Local Rule 230(l), the
unique posture of this case supports consideration of all plaintiff's filings in opposition to
26  defendant's motion for summary judgment, including plaintiff's surreply.

−3−

1  and a Title II claim pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§

2  12132 et seq.  Plaintiff seeks $710,00.00 general damages, $785,000.00 compensatory damages,

3  $750,000.00 punitive damages, and undefined injunctive relief.

4          Defendant moves for summary judgment on each of plaintiff's claims.

5  III.  Legal Standards for Summary Judgment

6          Summary judgment, in whole or in part (summary adjudication of issues), is

7  appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure

8  56(c) is met.  "The judgment sought should be rendered  if . . . there is no genuine issue as to any

9  material fact, and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

10  56(c).

11          Under summary judgment practice, the moving party always bears
           the initial responsibility of informing the district court of the basis
12          for its motion, and identifying those portions of "the pleadings,
           depositions, answers to interrogatories, and admissions on file,
13          together with the affidavits, if any," which it believes demonstrate
           the absence of a genuine issue of material fact.

14

15  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), quoting Federal Rule of Civil Procedure

16  56(c).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue,

17  a summary judgment motion may properly be made in reliance solely on the 'pleadings,

18  depositions, answers to interrogatories, and admissions on file.'"  Id.  Summary judgment should

19  be entered, after adequate time for discovery and upon motion, against a party who fails to make

20  a showing sufficient to establish the existence of an element essential to that party's case, and on

21  which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof

22  concerning an essential element of the nonmoving party's case necessarily renders all other facts

23  immaterial."  Id. at 323.  In such a circumstance, summary judgment should be granted, "so long

24  as whatever is before the district court demonstrates that the standard for entry of summary

25  judgment, as set forth in Rule 56(c), is satisfied."  Id.

26  ////

1   If the moving party meets its initial responsibility, the burden then shifts to the

2   opposing party to establish that a genuine issue as to any material fact actually exists.  See

3   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

4   to establish the existence of a factual dispute, the opposing party may not rely upon the

5   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

6   form of affidavits, and/or admissible discovery material, in support of its contention that a

7   dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

8   must demonstrate that the disputed fact is material, i.e., a fact that might affect the outcome of

9   the suit under governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

10  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

11  that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

12  for the nonmoving party, see Anderson, 477 U.S. at 248; T.W. Elec. Serv., 809 F.2d at 631.

13  In the endeavor to establish the existence of such a factual dispute, the opposing

14  party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

15  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

16  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

17  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

18  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e), Advisory

19  Committee's note on 1963 amendments).

20  In resolving a summary judgment motion, the court examines the pleadings,

21  depositions, answers to interrogatories, and admissions on file, together with any affidavits.  Fed.

22  R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  Anderson, 477 U.S. at

23  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

24  drawn in favor of the opposing party.  Matsushita, 475 U.S. at 587.  Nevertheless, inferences are

25  not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate

26  from which the inference reasonably may be drawn.  Richards v. Nielsen Freight Lines, 602 F.

1  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

2  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

3  some metaphysical doubt as to the material facts . . .  Where the record taken as a whole could

4  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

5  trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

6  III.  Facts

7         The following summary sets forth the relevant facts that are undisputed by the

8  parties or, following the court's review of the evidence, have been deemed undisputed for

9  purposes of the pending motion.  Disputed facts, where relevant, are also noted.

10         1.  The relevant events took place during plaintiff's incarceration at California

11  State Prison-Solano ("CSP-SOL"), under the authority of the California Department of

12  Corrections and Rehabilitation ("CDCR").

13         2.  In November 2008, while an inmate at CSP-SOL, plaintiff obtained surgical

14  fusion of vertebrae in his neck (C6-7) at Queen of the Valley Hospital, in Napa, California.  (See,

15  e.g., Dkt. No. 49 at 23-4.) When discharged from the hospital, plaintiff was provided two

16  medical pillows, which he was permitted to retain while housed in CSP-SOL's medical facility

17  (Building 16, Facility 3).  Although plaintiff was required to "log" the pillows at CSP-SOL's

18  medical facility, he was not required to have a medical "chrono," and his possession of the

19  pillows was not challenged.  (Pltf. Depo. at 30-31.)

20         3.  Nearly a year later, on October 8, 2009, plaintiff was moved from CSP-SOL's

21  medical facility to Building 15, Facility 3, a general population facility.  Pursuant to routine

22  procedure, defendant Deberry and another officer directed plaintiff to place all of his personal

23  property in a container measuring six cubic feet in volume, in order to demonstrate compliance

24  with CDCR's personal property limitations.

25         4.  Defendant required that plaintiff place his medical pillows and state-issued

26  blankets in the container, in addition to plaintiff's other property.  The pillows, along with

                                                    −6−

1    plaintiff's excess property, were later inventoried and placed in the property storage facility.

2    (Deberry Decl., Dkt. No. 43, ¶¶ 6-8.)  The process of going through all of plaintiff's property, to

3    determine what items were authorized, took two to four days.  (Pltf. Depo. at 65-6, 104-5.)

4         5.  Plaintiff testified at his deposition that, when defendant insisted plaintiff place

5    his blankets in the container, plaintiff informed defendant that he would challenge the matter

6    through the inmate appeal process, allegedly stating, "'Well, then I'll have to file my grievance.

7    I'll have to 602 you.'"  (Id. at 65.)  Plaintiff testified that defendant "got a little upset because I

8    said I was going to 602 him."  (Id.)  Plaintiff further alleges that, when defendant disagreed with

9    plaintiff about the property that plaintiff could keep and that which he would need to send home,

10   plaintiff stated, "'Okay.  I'll just file my appeal and let it go from there.'"  (Id.)

11        6.  Plaintiff also testified that, when defendant took his medical pillows, plaintiff

12   "told him what they were for, [and] he said, if I show him a chrono, he'll give them back."  (Id. at

13   22, 60.)

14        7.  The next day, October 9, 2009, plaintiff obtained from his primary care

15   physician, Dr. Jason Rohrer, a "Comprehensive Accommodation Chrono" (CDC Form 7410),[2]

16   authorizing, under the form title "Medical Equipment/Supplies," that plaintiff have a "pillow" for

17   a period of one year.  The chrono does not contain any description of the authorized pillow.  The

18   chrono was approved by the Chief Medical Officer ("CMO") on October 14, 2009.  (Pltf. Depo.

19   at 45; Defense Exh. 2.)[3]

20   ////

21

22        [2]  A "Comprehensive Accommodation Chrono" (CDC Form 7410) is to be completed by
     prison health care staff to provide "for accommodations that are medically necessary or are
23   required under the Americans with Disabilities Act (ADA)."  California Correctional Health Care
     Services, Inmate Medical Services Policies and Procedures, Vol. 4, Ch. 23 (Comprehensive
24   Accommodation Chrono), § I.

25        [3]  Curiously, the copy of this chrono attached to Dr. Rohrer's declaration reads "pillows"
     (plural.)  (Rohrer Decl., Exh. 1.)  However, Dr. Rohrer states that, pursuant to this chrono, he
26   approved issuance of a "pillow" (singular).  (Rohrer Decl., ¶ 6.)

–7–

1    8. Plaintiff testified that he showed defendant the chrono on October 22, 2009,

2    and asked defendant for one of his pillows; defendant allegedly responded that, because the

3    chrono had been written after the confiscation, plaintiff's doctor should issue a new medical

4    pillow.  (Pltf. Depo. at 22, 55, 63-4; Dkt. No. 44-1 at 9.)  Plaintiff testified that, during this

5    period, he also asked defendant "at least two or three times" for a regular CDCR-issued pillow,

6    without receiving one.  (Pltf. Depo. at 46, 55.)

7    9. Meanwhile, on October 12, 2009, plaintiff submitted an inmate appeal (Log

8    No. CSP-S-09-02257), challenging defendant's confiscation and retention of several items of

9    plaintiff's personal property, without reference to plaintiff's pillows.  Plaintiff requested that "all

10    the property be held pending the outcome of this appeal," and "for this kind of harassment to

11    stop."  (Dkt. No. 44-1 at 5.)

12    10. Defendant reviewed plaintiff's appeal at the informal level, and returned it to

13    plaintiff on October 29, 2009.  Defendant noted that plaintiff's personal property had exceeded

14    policy limitations, and that he had given plaintiff an opportunity to select items that came within

15    the allowable parameters.  (Id. at 5, 7.)  Defendant also noted that "[e]xcess property was

16    confiscated, inventoried and placed in a secure location in Housing Unit #15 until a

17    determination can be made for method of disposal by inmate Christ, per CCR 3191(c)."  (Id. at

18    7.)  There is no reference to plaintiff's pillows.

19    11. This appeal (Log No. CSP-S-09-02257) was partially granted at the First and

20    Second Levels, on the ground that plaintiff's property had been held pending the outcome of the

21    appeal, and because plaintiff was permitted the opportunity to determine what property to

22    surrender in order to come within departmental limitations.  At both levels of review, plaintiff's

23    allegations of harassment were found unsubstantiated.[4]  Neither decision references plaintiff's

24    _____

25    [4] Pursuant to the First Level Response, plaintiff was interviewed by Correctional
Sergeant Alexander, on November 22, 2009, who determined in pertinent part that "appellant's
allegations of harassment were unfounded as the appellant was unable to provide any

26    substantiating evidence on his behalf that would lead the reviewer to such a conclusion."  (Dkt.

–8–

1  pillows.  The record fails to demonstrate that plaintiff exhausted this appeal through the

2  Director's Level.

3          12.  On October 22, 2009, plaintiff filed a "Reasonable Modification or

4  Accommodation Request" (CDC Form 1824).  Plaintiff alleged that he was disabled under the

5  ADA due to his "C-Spine Surgery, Lower Back pain, with hip pain, Post-Gun Shot wound right

6  femur." (Dkt. No. 44-1 at 38.)  Plaintiff complained that defendant had confiscated plaintiff's

7  two "soft pillows" that had been given to plaintiff post-surgically, and refused to return them

8  despite plaintiff showing defendant Dr. Rohrer's October 9, 2009 chrono.[5]  Plaintiff sought the

9  return of both pillows, and "for this kind of harassment by C/O DeBerry to cease against myself

10  ASAP."

11          13.  On October 27, 2009, plaintiff was interviewed by Lt. J. S. Fecht, who

12  apparently "sent a sergeant over" to retrieve one of plaintiff's pillows.  (Pltf. Depo. at 22.)  When

13  plaintiff returned to his bunk on October 29, 2009, the pillow was there.  (Id. at 57.)  On

14  November 2, 2009, plaintiff signed the dispositional portion of Lt. Fecht's decision, which

15  provided in full:  "As stated above the appellant recieved (sic) (1) pillow on 10-29-09 upon

16

17  No. 44-1 at 9.)  Pursuant to the Second Level Response, issued by the CSP-SOL Warden on
    February 2, 2010, it was noted that "[a]lthough the appellant's property in total would fit within
    the allowable six cubic feet, the fact that he was in possession of more tha[n] the allowable

18  amount of several of these items justifies the confiscation of excess items by CO Deberry." (Id.
    at 4.)  As in the Second Level Response, the Warden found that plaintiff's allegations of

19  harassment by defendant were "unfounded," and that the appeal was "appropriately categorized

20  as a property issue and not a staff complaint matter."  (Id.)

21          [5]  Plaintiff fully described the problem in support of his October 22, 2009 (CDC Form
    1824) request as follows (Dkt. No. 44-1 at 38):

22          On Nov. 24, 2008 I had surgery and fusion at C6-7.  On 10-8-09 I was moved
            from building 16-22L to building 15-H-6L.  I had (2) soft pillows that came with

23          me from Queen of the Valley after C-spine surgery.  C/O DeBerry took both my
            pillows and said when you find your chrono from them just bring them up to me

24          and I will give you them back.  On 10-22-09 I showed C/O DeBerry my chrono
            for them and he now states "well I took your pillows on 10-08-09 and the chrono

25          is written on 10-09-09. So you cannot have them back. Dr. Jason Rohrer wrote
            this chrono because I need those soft pillows because of the pain that I have in my

26          neck.  Getting worse.

1    verification of his chrono.  At this time the appellant is in agreement with the action taken and he

2    is in possession of (1) pillow."  (Dkt. No. 44-1 at 39.)  This disposition was approved by the

3    Associate Warden on November 9, 2009, and the form was returned to plaintiff on November 10,

4    2009.  (Id.)

5         14.  Plaintiff's October 22, 2009 (CDC Form 1824) request was later designated

6    an inmate appeal, and assigned Log No. CSP-S-09-02157; pursuant to Lt. Fecht's resolution

7    noted above, the appeal was deemed partially granted at the First Level Review.  (Id. at 32.)

8         15.  On November 12, 2009, plaintiff saw Dr. Rohrer for complaints of increased

9    neck pain.  Dr. Rohrer increased plaintiff's pain medication, and signed a second Comprehensive

10   Accommodation Chrono (CDC Form 7410), which provided in full:  "Inmate should be allowed

11   to possess the two orthopedic pillows issued to him from Queen of the Valley Hospital status

12   post neck surgery x one year."  (Dkt. No. 44-2 at 1; see also Pltf. Depo. at 24, 46-48; Defense

13   Exh. 3)  Plaintiff testified that Dr. Rohrer, when signing the second chrono, stated that the first

14   chrono "'was supposed to be for both pillows, because that's what the hospital sent with you.'"

15   (Pltf. Depo. at 45.)  The second chrono was approved by the CMO on November 18, 2009.

16        16.  Plaintiff allegedly showed defendant the second chrono on November 25,

17   2009; however, defendant allegedly refused to provide plaintiff with his second pillow, and told

18   plaintiff to see Lt. Fecht or have his doctor issue another pillow.  (Dkt. No. 41-1 at 25; Pltf.

19   Depo. at 50, 52.)  Plaintiff testified that, after receiving the second chrono, he asked defendant

20   "at least twice" for his second pillow.  (Pltf. Depo. at 51, 52.)

21        17.  On November 26, 2009, plaintiff submitted another CDC Form 1824, which

22   staff determined was duplicative of plaintiff's initial CDC Form 1824.  Plaintiff was advised to

23   submit a CDC Form 602 requesting Second Level Review of his initial CDC Form 1824 (Log

24   No. CSP-S-09-02157).

25        18.  On December 2, 2009, plaintiff requested Second Level Review of his appeal

26   (Log No. CSP-S-09-02157), alleging that, on November 25, 2009, he had shown defendant the

second chrono issued by Dr. Rohrer, but defendant had refused to provide plaintiff with his second pillow, allegedly stating, "'go see Lt. Fecht,'" and "have your doctor issue you another pillow, if he wants you to have (2) pillows." (Dkt. No. 44-1 at 34.) Plaintiff stated that his neck pain had worsened; he requested immediate cessation of harassment by defendant and the return of both his medical pillows. (Id. at 31.)

19. Pursuant to the Second Level Review of plaintiff's appeal, issued December 16, 2009, Lt. D. Brida noted that he had contacted plaintiff on the same date, and plaintiff was then in possession of both pillows. (Id. at 25.) Hence, plaintiff's appeal, requesting the return of both pillows, and for cessation of the alleged harassment by defendant, was granted. (Id. at 32.)

20. On February 20, 2010, a Director's Level Decision was rendered by the Appeals Examiner, denying plaintiff's inmate appeal (Log No. CSP-S-09-02157). The Appeals Examiner noted plaintiff's allegations against defendant, but found "that staff acted appropriately." (Dkt. No. 44-1 at 26.) The Examiner relied on Dr. Rohrer's Comprehensive Accommodation Chronos (CDC Form 1740) to find that plaintiff's pillows were "medically necessary" within the meaning of 15 C.C.R. 3350(b)(1), but found, because plaintiff had obtained his pillows, that no additional accommodation was warranted. (Id. at 26.)

21. On March 5, 2010, plaintiff filed the underlying complaint in Santa Clara County Superior Court. On June 9, 2012, defendant, through counsel, removed this action to federal court; the case was transferred to this district in July 2010. This action proceeds on plaintiff's original complaint, pursuant to plaintiff's claims that defendant confiscated and retained plaintiff's pillows in violation of plaintiff's rights under the Eighth Amendment and the Americans with Disabilities Act, and in retaliation for plaintiff's exercise of his First Amendment rights.

22. Plaintiff testified that, prior to October 8, 2009, he did not know defendant DeBerry and had not had any personal contact with him. (Pltf. Depo. at 27.) Plaintiff also testified that, after he obtained both of his pillows, he had no further relevant contact with

1   defendant,[6]  because, approximately two months thereafter, plaintiff was sent to administrative

2   segregation and thereafter transferred to Avenal State Prison.  (Id. at 38, 51, 54, 113.)

3          23.  The complaint alleges that, as a result of the confiscation of his pillows,

4   plaintiff "suffered numerous sleepless and painful nights and days for 21 days before the first

5   pillow was re-issued, and approximately 69 days for the 2nd pillow to be re-issued. . . ." (Cmplt.,

6   Dkt. No. 1 at 9.)  The complaint states that plaintiff's "physician increased Plaintiff's pain

7   medications because of Plaintiff being forced to sleep absent the two pillows." (Id.)  Plaintiff

8   testified that, for the first thirty nights following the confiscation of his pillows, he experienced

9   severe pain in his neck, particularly at night, and got little sleep.  (Pltf. Depo. at 66-71.)  Plaintiff

10  stated that the pillows are most effective when used in tandem.  (Id. at 102-3, 108-12.)  Without

11  either pillow, plaintiff attempted to use rolled-up clothing items and towels in an effort to create

12  a pillow, but this alternative was not effective.  (Id. at 103-5.)

13          24.  Plaintiff testified that, while his pain decreased some with increased

14  medications in November 2009, his neck still bothers him more now than when he was moved to

15  CSP-SOL's Building 15, including pain radiating down his back.  Plaintiff also has headaches.

16  (Id. at 70, 74, 76-8.)  Plaintiff opined that "due to not having my pillows at a crucial healing

17  point, [my neck] didn't heal right," and that, "if I would have had my pillows during that period

18  of time I wouldn't have the problems I'm going through now." (Id. at 70, 71.)  Plaintiff testified

19  that, in 2011, he was seen by a surgeon who opined that plaintiff's continuing wrist pain, despite

20  carpal tunnel surgery, could be attributable to his neck problems.  (Id. at 71-74, 93, 96, 113.)

21  Plaintiff described current neck pain that radiates to his shoulder and right hand, and a sharp pain

22  in his right wrist, causing numbness and tingling in his right hand.  (Id. at 75.)  Plaintiff testified

23

24          [6]  Plaintiff testified that he pursued a subsequent inmate appeal against defendant,
    alleging that, after defendant failed to respond to plaintiff's second chrono, defendant also
25  refused to sign plaintiff's legal mail.  (Pltf. Depo. at 52-3, 66.)  However, at his deposition,
    plaintiff agreed with defense counsel that his challenges against defendant regarding the
26  processing of plaintiff's legal mail are not part of the present action.  (See id. at 14, 18, 53.)

1    that, during his most severe pain, he lost appetite, declined family visits and telephone calls, and

2    missed work and yard time.  (Id. at 74, 81-3, 89-90.)

3              25.  In a verified declaration filed January 17, 2012,[7] defendant DeBerry avers as

4    follows (Dkt. No. 43 at 1-4):

5              (a)  Defendant has worked continuously at CSP-SOL since October 2002.

6              (b)  During the relevant period, at least 17 CDCR employees were assigned to

7    work at CSP-SOL's Building 15 within each 24-hour period.

8              (c)  "[I]n accordance with Department Operations Manual, Section 54030.4,

9    prison policy provides that the combined volume of state-issued and allowable personal property

10   items of an inmate in general population shall not exceed six cubic feet excluding designated

11   work clothing and work shoes.  Moreover, Section 54030.4 provides that in addition to the six

12   cubic feet of property, an inmate may possess [only] two of the following: television set, radio,

13   tape/record recorder, typewriter, musical instrument, or a tv/radio/tape player combination unit."

14             (d)  "Christ was transferred to Building 15 on or about October 8, 2009.  I do not

15   recall having any contact with Christ before October 8, 2009.  After he was transferred to

16   Building 15, I inspected and searched Christ's property before he was assigned to his cell[8] in

17   accordance with prison policy.  I conducted this inspection with Officer Tambini.  I recall that

18

19       [7]  Plaintiff objects to the fact that defendant failed to specify the date in January 2012

20   when he signed his declaration.  (See Dkt. No. 49 at 14.)  The declaration provides in pertinent
     part that defendant affixed his signature thereto, under penalty of perjury, on "January ___,
     2012." (Dkt. No. 43 at 4.)  The declaration was filed on January 17, 2012.  While a declaration,

21   to be valid, must provide the date of signing, see 28 U.S.C. § 1746, the court finds that defendant
     substantially complied with this requirement.  Defendant necessarily signed his declaration

22   sometime between January 1 and January 17, 2012, and the declaration was timely filed in
     support of defendant's motion for summary judgment.  Due to this narrow time frame, and the

23   lack of prejudice to plaintiff (the contents of the declaration address matters that occurred in
     2009), plaintiff's objection is overruled.  Accord Manriquez v. Huchins, 2012 WL 5880431 at *3

24   (E.D. Cal. 2012) (finding substantial compliance with requirement that verified discovery
     responses include date of execution, given limited time frame within which signing occurred).

25

26       [8]  Plaintiff states that, where he was housed, there "are no cells . . . only dorms." (Dkt.
     No. 49 at 13.)

1   Christ had more property than was allowed by the prison rules.  As such, we were obligated to

2   limit the amount of property he kept in his new cell in Building 15.  The property that did not

3   remain in his possession was inventoried and placed inside the property storage facility in

4   Building 15. . . . Christ's excess property was inventoried and the chronos were completed by

5   another officer.  I did not complete the chronos itemizing the property confiscated from Christ

6   and stored in the property storage facility."

7          (e)  Plaintiff's inventoried and stored property included "two pillows.  Christ

8   stated that the pillows were provided to him by a non-CDCR hospital.  Christ did not have a

9   medical chrono, or other documentation, for the two pillows.  Prison policy, including Section

10  54030.4, provides that an inmate shall possess only the amount of property that is specifically

11  authorized.  As such, under prison policy, he was not permitted to retain these pillows without a

12  chrono or other documentation.  In accordance with prison policy, the two pillows were placed

13  inside the property storage facility."

14         (f)  "I understand that Christ has alleged that I confiscated his two pillows in

15  retaliation for inmate appeals he filed against me.  However, at no time did I confiscate his two

16  pillows in retaliation for an inmate appeal filed against me.  In fact, at the time the pillows were

17  removed from Christ's custody, I was not aware of any inmate appeal he may have filed against

18  me."

19         (g)  "Once removed from [plaintiff's] possession, the two medical pillows were

20  placed in the property storage facility.  As such, I was not in possession of Christ's two medical

21  pillows after October 8, 2009.  Moreover, at no time did I have sole custody or control of the two

22  medical pillows.  Christ had multiple options for retrieving or replacing his two medical pillows.

23  Christ could have contacted one of the other sixteen CDCR employees assigned to work in his

24  housing unit, he could have obtained medical pillows through the CSP-Solano medical

25  department, or he could have completed the appeals process."

26  ////

1          (h) "At the time the two pillows were placed in the property storage facility, I

2  understood that prison policy would not permit Christ to retrieve the two pillows because they

3  were not issued by CDCR.  I understand that prison policy would require the inmate to request

4  that the medical department issue him two replacement medical pillows or have a higher ranking

5  correctional staff member grant him permission to obtain the two medical pillows that were

6  confiscated."

7          (i)  "In a prison setting, property is strictly maintained to secure the safety of

8  prison inmates and employees.  Property that is not issued by CDCR may be used to conceal or

9  transport contraband such as weapons, narcotics, or other materials not permitted in the prison.

10  As such, as a correctional officer I did not believe that I had the authority to return the two

11  pillows to Christ because it would have presented a potential security risk since the source of the

12  pillows could not be traced for certain[,] [p]articularly since Christ did not possess a chrono, or

13  other documentation, showing that the two medical pillows had been issued by CDCR or another

14  entity."

15          26.  Dr. Rohrer, who has worked as a physician at CSP-SOL since January 2002,

16  filed a verified declaration, dated January 12, 2012, that provides as follows (Dkt. No. 41 at 1-3):

17          (a)  Dr. Rohrer was plaintiff's primary care physician when plaintiff had cervical

18  spine surgery in November 2008.

19          (b)  Generally, it takes a patient approximately six weeks to recover from cervical

20  spine surgery.

21          (c)  Plaintiff had likely "fully healed" from his cervical spine surgery by October

22  2009.

23          (d)  On October 9, 2009, Dr. Rohrer issued a Comprehensive Accommodation

24  Chrono providing plaintiff with a pillow for a period of one year.

25          (e)  On November 12, 2009, Dr. Rohrer issued another Comprehensive

26  Accommodation Chrono authorizing plaintiff's possession of "the two orthopedic pillows issued

1  to him from Queen of the Valley Hospital status post neck surgery x one year."

2  (f)  Dr. Rohrer stated that he "issued the chronos because Christ requested them --

3  not because they were medically necessary.  Although not medically necessary, I issued the

4  chronos as a means to possibly provide Christ with more comfort -- physical or psychological --

5  and convenience."

6  27.  Dr. Robert Chapnick, CMO at Avenal State Prison, where plaintiff was

7  transferred in September 2010 (Pltf. Depo. at 10), reviewed plaintiff's Unit Health Record

8  ("UHR"), and filed a verified declaration, dated January 11, 2012, that provides as follows (Dkt.

9  No. 42 at 1-3):

10  (a)  Plaintiff's cervical spine surgery was performed on November 24, 2008, at

11  Queen of the Valley Hospital, a non-CDCR hospital, by Dr. Jason Huffman, whose discharge

12  summary did not recommend medical pillows.

13  (b)  Plaintiff was subsequently seen by neurosurgeon Dr. Moris Seneger, whose

14  consultation notes did not recommend medical pillows.

15  (c)  Review of plaintiff's UHR did not reveal "any documentation that [plaintiff]

16  was ever prescribed medical pillows or that he ever requested a medical pillow prescription."

17  (d)  The only relevant documentation in plaintiff's UHR were Dr. Rohrer's

18  chronos issued October 9, 2009, and November 12, 2009.

19  (e)  Based on this review, Dr. Chapnick concluded that there is no basis in

20  plaintiff's medical records to support plaintiff's allegation that the two subject pillows were

21  medically necessary.

22  (f)  Moreover, Dr. Chapnick "found no indication that the medical pillows were

23  needed for [plaintiff] to perform his Activities of Daily Living within the meaning of the

24  Americans with Disabilities Act (ADA)."

25  28.  One of plaintiff's witnesses, inmate Phil Pappas, is deceased.  Pursuant to the

26  court's order filed July 16, 2012, Mr. Pappas' answers to plaintiff's interrogatories have been

deemed admissible evidence in opposition to defendants' motion for summary judgment.[9]  Fed. R. Civ. P. 56(c)(1)(A).  (Dkt. No. 55.)  Plaintiff testified that Mr. Pappas was present when plaintiff "first moved into the building," when defendant took plaintiff's pillows, and when plaintiff packed up his property.  Every time that plaintiff subsequently went through his property, he was accompanied by Mr. Pappas.  (Pltf. Depo. at 99-100.)  In his verified answers to plaintiff's interrogatories, signed May 12, 2011, Mr. Pappas stated in pertinent part that defendant confiscated plaintiff's medical pillows on October 8, 2009, and that Mr. Pappas assisted plaintiff with paperwork to retrieve his pillows.  Mr. Pappas opined that defendant harassed plaintiff by requiring plaintiff to place his two state-issued blankets inside the property container.[10]  (Dkt. No. 52.)

---

[9]  As previously stated, the undersigned states no opinion on the admissibility of this evidence should this case proceed to trial, in which case plaintiff must raise the issue anew before the trial judge.

[10]  Given their brevity, the court recites each of plaintiff's interrogatories and Mr. Pappas' answers thereto (set forth in Dkt. No. 53 at 4-7).  References to plaintiff's legal mail are not part of this action.  (See n.6, supra.)

Question 1:  On October 8, 2009, did you see Correctional Officer S. DeBerry confiscate Plaintiff's (2) two medical pillows from him, when plaintiff moved into building 15, CSP-Solano, 2100 Peabody Rd. Vacaville, CA 95696?
Answer:  Yes.

Question 2:  Did you help plaintiff get his medical pillows back by paperwork i.e. . . (602, ADA Appeals)?
Answer:  Yes.

Question 3:  After plaintiff filed his appeal against C/O DeBerry, did you know of a time when C/O DeBerry refused to sign plaintiff's outgoing legal mail?
Answer:  Yes, directly thereafter per filing [illegible] appeal.

Question 4:  Do you know the reason why C/O DeBerry would not sign plaintiff's outgoing legal mail?
Answer:  Yes, C/O DeBerry said he didn't want to go against staff or himself.

Question 5:  Did you see defendant DeBerry going through all of plaintiff's personal property, and did you see plaintiff putting his (2) two state issued wool blankets inside the 6 cubic foot cart?
Answer:  Yes.

1    IV.  DISCUSSION

2           A.  Americans with Disabilities Act Claim

3           Plaintiff claims that defendant's confiscation and alleged retention of his medical

4    pillows violated plaintiff's rights under the Americans with Disabilities Act.[11]  Defendant moves

5    for summary judgment on this claim, on the ground that the record fails to demonstrate that

6    plaintiff had a qualifying disability.  For the reasons that follow, the court recommends that

7    summary judgment be granted for defendant on this claim.

8           1.  Legal Standards

9           Title II of the ADA provides that "no qualified individual with a disability shall,

10   by reason of such disability, be excluded from participation in or be denied the benefits of the

11   services, programs, or activities of a public entity, or be subjected to discrimination by any such

12   entity." 42 U.S.C. § 12132.  The ADA applies to inmates and parolees in the state correctional

13   system.  Armstrong v. Wilson, 124 F.3d 1019, 1022-24 (9th Cir. 1997).

14          An individual has a "disability" within the meaning of Title II of the ADA if he

15   has "(A) a physical or mental impairment that substantially limits one or more major life

16   activities of such individual; (B) a record of such an impairment; or (c) [are] regarded as having

17   such an impairment . . . ."[12]  42 U.S.C. § 12102(1).  To prevail on a claim of disability

18   ──────────────

19   Question 6:  Did you find out the reason plaintiff put his (2) two state issued
     blankets inside the 6 cubic foot car?
20   Answer:  Yes.  To harass inmate Christ (via Warden's 602 response).

21   Question 7:  Did you know that defendant DeBerry was harassing plaintiff?
     Answer:  Yes.

22   [11]  On screening, based on a liberal construction of the complaint, the court found that
     "[p]laintiff's claim that Deberry improperly confiscated plaintiff's medical pillows may state a
23   potentially cognizable ADA claim based on plaintiff's implicit contention that he was denied
     access to reasonable bedding materials by reason of his disability."  (Dkt. No. 18 at 5.)
24

25   [12]  "Major life activities" include, but are not limited to, "caring for oneself, performing
     manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking,
26   breathing, learning, reading, concentrating, thinking, communicating, and working."  Id., §
     12102(2)(B).  "An individual meets the requirement of 'being regarded as having such an

1    discrimination under Title II, a plaintiff must demonstrate that:  "(1) the plaintiff is an individual

2    with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of

3    some public entity's services, programs, or activities; (3) the plaintiff was either excluded from

4    participation in or denied the benefits of the public entity's services, programs, or activities, or

5    was otherwise discriminated against by the public entity; and (4) such exclusion, denial of

6    benefits, or discrimination was by reason of the plaintiff's disability."  Thompson v. Davis, 295

7    F.3d 890, 895 (9th Cir. 2002), cert. denied, 538 U.S. 921 (2003) (citing Weinreich v. L.A.

8    County Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997).

9            2.  Analysis

10           The proper defendant in a Title II claim is the public entity allegedly responsible

11   for the discrimination.  "Public entities" include state prisons.  Pennsylvania Dept. of Corrections

12   v. Yeskey, 524 U.S. 206, 210 (1998).  Therefore, for present purposes, and despite defendant's

13   lack of a supervisory role, the court construes plaintiff's Title II claim against defendant in his

14   official capacity only.  See e.g. Miranda B. v. Kitzhaber, 328 F.3d 1181, 1187-88 (9th Cir. 2003).

15           Even assuming that plaintiff's neck pain could reasonably be construed as a

16   "disability" within the meaning of the ADA,[13] plaintiff has failed to present any evidence to

17   support the remaining elements of this claim.  The ADA is designed to challenge the denial of a

18   benefit or service accorded similarly situated individuals -- i.e., discrimination -- "by reason of"

19   the plaintiff's disability.  The premise of plaintiff's complaint is that his neck pain entitled him to

20   _____

21   impairment' if the individual establishes that he or she has been subjected to an action prohibited
     under this chapter because of an actual or perceived physical or mental impairment whether or
     not the impairment limits or is perceived to limit a major life activity."  Id., § 12102(3)(A).

22   However, an individual may not be "regarded as having such an impairment" if the impairment is
     "transitory and minor," a transitory impairment defined as "an impairment with an actual or

23   expected duration of 6 months or less."  Id., § 12102(3)(B).

24           [13]  There remains a threshold issue whether plaintiff's neck pain (as well as his other
     alleged disabilities (lower back, hip pain, and healed right femur wound)) can reasonably be

25   construed as a qualifying "disability" within the meaning of the ADA.  The only medical opinion
     of record is that of Dr. Chapnick, who found that plaintiff's medical records do not support such

26   a finding.  (Dkt. No. 42 at 2-3.)

1  possession of medical pillows, not that he was denied medical pillows "by reason of" his neck

2  pain.  It is axiomatic that "a plaintiff proceeding under Title II of the ADA must . . . prove that

3  the exclusion from participation in the program was 'solely by reason of disability.'"  Does 1-5 v.

4  Chandler, 83 F.3d 1150, 1155 (9th Cir. 1996) (quoting Sandison v. Michigan High School

5  Athletic Ass'n, Inc., 64 F.3d 1026, 1036-37 (6th Cir. 1995) (plaintiffs barred from participating

6  in high school athletics by reason of their age, not their disability); accord Weinreich v. Los

7  Angeles County Metropolitan Transp. Authority, 114 F.3d 976, 978-79 (9th Cir. 1997) (plaintiff

8  excluded from financial assistance program "due to his financial circumstances, not to his

9  medical disability").  Morever, as earlier noted, Dr. Chapnick opined, after reviewing all of

10  plaintiff's medical records, that the subject pillows were not needed to enable plaintiff to perform

11  "activities of daily living," within the meaning of the ADA.  (Dkt. No. 42 at 2-3.)

12        Accordingly, as there is no relevant triable issue of fact, the court finds that

13  defendant is entitled to summary judgment on plaintiff's ADA claim as a matter of law.

14   B.  Eighth Amendment Claim

15        Plaintiff claims that defendant's confiscation and alleged retention of his medical

16  pillows constituted deliberate indifference to plaintiff's serious medical needs in violation of the

17  Eighth Amendment.  Defendant moves for summary judgment on the ground that plaintiff's

18  alleged harm was not "sufficiently serious" to trigger Eighth Amendment protections; defendant

19  also contends that his challenged conduct was consistent with prison rules, and not motivated by

20  an intent to harm plaintiff.  Defendant also relies on these arguments to assert, alternatively, that

21  his challenged conduct is subject to qualified immunity.  For the reasons that follow, the court

22  recommends summary judgment on plaintiff's Eighth Amendment claim.

23   1.  Legal Standards

24        To establish deliberate indifference, a plaintiff must show that the defendant knew

25  of, and disregarded, an excessive risk to plaintiff's health or safety.  Farmer v. Brennan, 511 U.S.

26  825, 837 (1994).  "In the Ninth Circuit, the test for deliberate indifference consists of two parts.

First, the plaintiff must show a serious medical need by demonstrating that failure to treat a

prisoner's condition could result in further significant injury or the unnecessary and wanton

infliction of pain.  Second, the plaintiff must show the defendant's response to the need was

deliberately indifferent.  This second prong . . . is satisfied by showing (a) a purposeful act or

failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the

indifference."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations,

punctuation and quotation marks omitted).  Stated differently, a finding of deliberate indifference

requires proof of the following objective and subjective factors:

> [A]n inmate seeking to prove an Eighth Amendment violation
> must "objectively show that he was deprived of something
> 'sufficiently serious,'" and "make a subjective showing that the
> deprivation occurred with deliberate indifference to the inmate's
> health or safety."  [Foster v. Runnels, 554 F.3d 807 (9th Cir.
> 2009)] at 812 (quoting Farmer v. Brennan, 511 U.S. 825, 834
> (1994)).  The second step, showing "deliberate indifference,"
> involves a two part inquiry.  First, the inmate must show that the
> prison officials were aware of a "substantial risk of serious harm"
> to an inmate's health or safety.  Farmer, 511 U.S. at 837.  This part
> of our inquiry may be satisfied if the inmate shows that the risk
> posed by the deprivation is obvious.  See id. at 842 ("[A] factfinder
> may conclude that a prison official knew of a substantial risk [to a
> prisoner's health] from the very fact that the risk was obvious.").
> Second, the inmate must show that the prison officials had no
> "reasonable" justification for the deprivation, in spite of that risk.
> See id. at 844 ("[P]rison officials who actually knew of a
> substantial risk to inmate health or safety may be found free from
> liability if they responded reasonably.").

Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010); see also Wilson v. Seiter, 501 U.S.

294, 298 (1991).

Prisons officials defending a deliberate indifference claim may avoid liability by

demonstrating "that they did not know of the underlying facts indicating a sufficiently substantial

danger and that they were therefore unaware of a danger, or that they knew the underlying facts

but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or

nonexistent."  Farmer, supra, 511 U.S. at 844.  Thus, a prison official may also avoid liability by

presenting evidence that he lacked knowledge of the risk, and/or that his response was reasonable

1  in light of all the circumstances.  Id. at 844-45.

2          2.  Analysis

3          a.  Serious Medical Need

4          "Serious medical needs" include medical conditions that cause substantial and

5  chronic pain.  Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases).  A

6  "serious" medical need exists if the failure to treat a prisoner's condition could result in further

7  significant injury or the "unnecessary and wanton infliction of pain."  McGuckin, supra, 974 F.2d

8  at 1059 (citing Estelle, 429 U.S. at 104).  "[S]erious medical needs" include conditions that a

9  reasonable doctor would find worthy of comment or treatment, that significantly impact the

10  inmate's daily activities, or that cause chronic and substantial pain.  Id. at 1059–60 (citing Wood,

11  900 F.2d at 1337–41).

12          Viewing the evidence in the light most favorable to plaintiff, solely for purposes

13  of summary judgment, the court finds that plaintiff's post-surgical neck condition and pain

14  during the relevant period constituted a "serious medical need" under the Eighth Amendment.

15          b.  Seriousness of Deprivation

16          Defendant contends that plaintiff's lack of access to his medical pillows was,

17  objectively, not a "sufficiently serious deprivation" to trigger Eighth Amendment protections,

18  because plaintiff's pillows were not "medically necessary."  Plaintiff responds that his

19  continuous possession of both pillows was medically necessary, because their deprivation caused

20  plaintiff pain and discomfort, and interfered with the healing process following his cervical

21  surgery, as demonstrated by the exacerbation of plaintiff's neck, wrist and back problems.

22          In determining whether a deprivation is "sufficiently serious" within the meaning

23  of the Eighth Amendment, the court must consider "the circumstances, nature, and duration" of

24  the deprivation.  Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000).  "Prison officials have a

25  duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical

26  care, and personal safety."  Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (citations

1   omitted).  "The more basic the need, the shorter the time it can be withheld."  Hoptowit v. Ray,

2   682 F.2d 1237, 1259 (9th Cir.1982).  "More modest deprivations can also form the objective

3   basis of a violation, but only if such deprivations are lengthy or ongoing."  Johnson, 217 F.3d at

4   731 (citation omitted).

5           The objective evidence of record in support of plaintiff's assertion that his pillows

6   were "medically necessary" is limited to the following:  (1) Dr. Rohrer's second Comprehensive

7   Accommodation Chrono (CDC Form 7410),[14] approved by the CMO on November 18, 2009,

8   which specifically authorized plaintiff's possession of both medical pillows provided by Queen

9   of the Valley Hospital;[15] and (2) the February 20, 2010, Director's Level Decision on plaintiff's

10  pertinent inmate appeal (Log No. CSP-S-09-02157), wherein the Appeals Examiner expressly

11  found that the November 18, 2009 approval of Dr. Rohrer's second chrono supported a finding

12  that plaintiff's pillows were "medically necessary."  (Dkt. No. 44-1 at 26.)

13          These limited findings of medical necessity are undermined by the remainder of

14  the record.  Dr. Rohrer, who was plaintiff's primary care physician during the relevant period,

15  refuted any finding of "medical necessity" in his January 2012 declaration.  Dr. Rohrer explained

16  that he "issued the chronos because Christ requested them -- not because they were medically

17  necessary.  Although not medically necessary, I issued the chronos as a means to possibly

18  provide Christ with more comfort -- physical or psychological -- and convenience."  (Dkt. No. 41

19

20          [14]  As earlier noted, a Comprehensive Accommodation Chrono (CDC Form 7410), is
    expressly intended for the purpose of authorizing inmate accommodations that are either
21  "medically necessary" or otherwise required under the ADA.  California Correctional Health
    Care Services, Inmate Medical Services Policies and Procedures, Vol. 4, Ch. 23 (Comprehensive
22  Accommodation Chrono), § I.  (See n.2, supra.)  Department regulations define "medically
    necessary" accommodations as "health care services that are determined by the attending
23  physician to be reasonable and necessary to protect life, prevent significant illness or disability,
    or alleviate severe pain, and are supported by health outcome data as being effective medical
24  care."  15 C.C.R. § 3350(b)(1).  "Severe pain" is defined as "a degree of discomfort that
    significantly disables the patient from reasonable independent function."  Id., § 3350(b)(4).
25

26          [15]  Dr. Rohrer's first chrono, authorizing only a "pillow," though set forth on a CDC Form
    1740, was too general to support a finding of medical necessity.

-23-

1    at 3.)  Dr. Rohrer further opined that, because it normally takes a patient six weeks to recover

2    from the type of cervical surgery plaintiff received, it is likely that plaintiff was "fully healed"

3    during the pertinent time period in this action (eleven to twelve months after plaintiff's surgery).

4    (Id. at 2.)

5           Plaintiff's evidence is also undermined by the medical opinion of Dr. Chapnick,

6    Avenal State Prison CMO.  Pursuant to his review of plaintiff's medical records, Dr. Chapnick

7    found that neither plaintiff's surgeon (Dr. Huffman), nor the neurosurgeon who evaluated

8    plaintiff post-surgically (Dr. Seneger), prescribed or recommended medical pillows for plaintiff.

9    (Dkt. No. 42 at 2.)  Dr. Chapnick opined that there is no evidence in plaintiff's medical records to

10   support a finding that his possession of the subject pillows was medically necessary; rather, Dr.

11   Chapnick concurred with Dr. Rohrer that the pillows were authorized only for the purpose of

12   providing plaintiff additional comfort.  (Id.).

13          Plaintiff has submitted additional evidence, dated subsequent to the relevant

14   period, which he asserts supports a finding of medical necessity.  Plaintiff testified that he was

15   issued a "replacement cervical pillow" in November 2010, while housed at Avenal State Prison.

16   (Pltf. Depo. at 106-7; see also Dkt. No. 49 at 26.)  In addition, a Medical Classification Chrono,

17   dated June 2011, accords plaintiff permanent "limited duty" status based, in part, on his neck

18   problems.  (Dkt. No. 49 at 19-20.)  Plaintiff has also submitted several records documenting his

19   wrist and low back pain, including a December 27, 2011 consultation recommending lumbar

20   surgery.  (Id. at 16-18; see also id. at 19-22, 25.)  While this new evidence appears to

21   demonstrate that plaintiff has had some continuing neck problems, the court finds that it is not

22   probative on the question of medical necessity of the two subject pillows during the relevant

23   period.

24          Clearly, the weight of the evidence, particularly the medical opinions of Dr.

25   Rohrer and Dr. Chapnick, supports a finding that plaintiff's medical pillows were not medically

26   necessary.  Nevertheless, construing the evidence in plaintiff's favor, as the court must on

1  summary judgment, a finding of "medical necessity" remains supported by the express terms of

2  Dr. Rohrer's second Comprehensive Accommodation Chrono (CDC Form 7410), as approved by

3  the CMO on November 18, 2009, and as so construed at the Director's Level on February 20,

4  2010.

5          This limited finding of medical necessity does not, however, dictate a further

6  finding that plaintiff's temporary denial of access to his medical pillows constituted a

7  "sufficiently serious deprivation" triggering Eighth Amendment protections.  On the contrary, the

8  court finds that the limited duration of the deprivation, and lack of evidence of resulting harm,

9  fail to sustain plaintiff's Eighth Amendment claim.  Plaintiff had access to neither medical pillow

10 for a period of only twenty-one days;[16] plaintiff received his second medical pillow forty-eight

11 days thereafter, during which he had been prescribed increased pain medications.  Plaintiff

12 testified that his pain began to subside after he was provided with one of his pillows.  (Pltf. Depo.

13 at 76-79.)  The record lacks support for plaintiff's allegations of long-term injury.  While

14 accepting as true plaintiff's allegations of increased pain, discomfort, and difficulty sleeping due

15 to the deprivation of his pillows, it is reasonable to infer that these symptoms were only

16 temporary.  Plaintiff has failed to demonstrate a triable issue of fact whether the deprivation of

17 his pillows caused, or substantially risked, serious harm to plaintiff.

18         For these reasons, the court finds that plaintiff's deprivation was not "sufficiently

19 serious" to trigger Eighth Amendment protections.  Accord Knight v. Evans, 2008 WL 5225863,

20 *5  (N.D. Cal. 2008) (delay in providing medical appliances, including medical-gel mattress,

21 medical-issued pillow, back brace and ankle braces, constituted no more than negligence) (citing

22 cases); see also Johnson, 217 F.3d at 731 (a modest deprivation can support an Eighth

23 Amendment violation only if it is lengthy or ongoing).  "If the harm is an isolated exception to

24

25         [16]  While plaintiff testified that he had no pillow for this 21-day period, neither his claims
   against defendant, nor his briefing in opposition to the pending motions, are premised on the
26 alleged deprivation of a regular pillow.

1   the defendant's overall treatment of the prisoner it ordinarily militates against a finding of

2   deliberate indifference." Jett, 439 F.3d at 1096.

3            c. Defendant's Challenged Conduct

4            Even if the record could reasonably be construed to support a finding that

5   plaintiff's temporary deprivation of his medical pillows was a "sufficiently serious deprivation"

6   warranting Eighth Amendment protections, plaintiff has failed to demonstrate that defendant was

7   aware that such deprivation could have posed a significant risk of serious harm to plaintiff, or

8   that defendant was uniquely responsible for remedying such risk.

9            To sustain a federal constitutional claim against a particular defendant, the

10  plaintiff must demonstrate an affirmative link or causal connection between the alleged

11  constitutional violation and the defendant's challenged conduct. Rizzo v. Goode, 423 U.S. 362,

12  371 (1976); Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978); Leer v. Murphy, 844 F.2d 628,

13  633 (9th Cir. 1988).  In addition, to sustain an Eighth Amendment deliberate indifference claim,

14  the plaintiff must demonstrate that the defendant was both:  (1) aware of a substantial risk of

15  serious harm to plaintiff, by reason of the alleged deprivation; and (2) had no reasonable

16  justification for causing, or failing to remedy, the deprivation.  Thomas, supra, 611 F.3d at 1150-

17  51, and cases cited therein.

18           The court analyzes defendant's alleged failure to act based on the following time

19  periods:  (1) defendant's October 8, 2009 confiscation of both pillows;  (2) the one-week period

20  from October 22, 2009 (when plaintiff showed defendant Dr. Rohrer's first chrono) to October

21  29, 2009 (when plaintiff obtained his first pillow); and (3) the three-week period from November

22  25, 2009 (when plaintiff showed defendant Dr. Rohrer's second chrono) to December 16, 2009

23  (when plaintiff obtained his second pillow).

24           It is undisputed that, when plaintiff moved to Facility 15 on October 8, 2009, he

25  had no documentation supporting his possession of the medical pillows.  Therefore, defendant

26  appropriately relied on departmental rules to confiscate both pillows.  Plaintiff's assertion that it

1   should have been clear to defendant that the pillows were "health care" or "medical" appliances,

2   is unavailing.  See CDCR Department Operations Manual ("DOM"), § 54030.10 ("health care

3   appliances" must be "prescribed by health care staff and subject to approval by designated

4   custody staff").[17]  Plaintiff's related claim that defendant was intentionally harassing plaintiff,

5   allegedly demonstrated by including plaintiff's pillows and state-issued blankets in the volume

6   assessment, is also unavailing.  Absent clear authorization for the pillows as health care

7   appliances, they were properly included in the volume assessment.  Cf. 15 C.C.R. § 3190(i)(1)

8   (only "Health Care Appliances [that are] subject to prescription by health care staff and approval

9   by designated custody staff, shall be excluded from the six cubic foot limitation of section

10  3190(c).").  Plaintiff's blankets were also appropriately included, despite being state-issued.  See

11  D.O.M. § 54030.4 ("The combined volume of state-issued and authorized personal property shall

12  not exceed six cubic feet . . . .").  Moreover, the record demonstrates that plaintiff was ultimately

13  required to forfeit personal property because it exceeded quantity limitations (e.g., number of

14  electrical appliances), not volume limitations.

15          This evidence supports a finding that defendant's confiscation of plaintiff's

16  pillows on October 8, 2009 was reasonably justified because it comported with departmental

17  rules.  Moreover, because plaintiff had no authorization for the pillows, there is no basis for

18  inferring that defendant should have been aware that their confiscation could pose a substantial

19  risk of serious harm to plaintiff.  For these reasons, the court finds, as a matter of law, that

20  defendant did not violate plaintiff's Eighth Amendment rights by confiscating plaintiff's medical

21  pillows on October 8, 2009.

22  ////

23

---

24      [17]  See also 15 C.C.R. § 3358(b) ("No inmate shall be deprived of a *prescribed* orthopedic
    or prosthetic appliance in the inmate's possession upon arrival into the department's custody or
25  *properly obtained* while in the department's custody unless a department physician or dentist
    determines the appliance is no longer needed and the inmate's personal physician, if any, concurs
26  in that opinion.")  (Emphasis added.)

1    The next relevant date is October 22, 2009, when plaintiff showed defendant Dr.

2    Rohrer's first chrono, which authorized only generally that plaintiff be provided a "pillow."

3    Plaintiff testified that defendant stated he would not release one of plaintiff's pillows because the

4    chrono post-dated the confiscation.  It is also reasonable to infer that defendant declined to

5    retrieve one of plaintiff's medical pillows because the chrono did not so specify.  A week later,

6    on October 29, 2009, plaintiff obtained one of his pillows through the efforts of Lt. Fecht.

7    Defendant's verified declaration provides that it was his understanding that prison

8    policy required that plaintiff be issued new medical pillows, or that "a high ranking correctional

9    staff member grant him permission to obtain the two medical pillows that were confiscated."

10   (Id.)  Defendant's first statement is consistent with department regulations, noted above, that

11   require proper written authorization for an inmate's possession of medical appliances.

12   Defendant's stated deference to higher ranking officials is also consistent with department policy.

13   In fact, higher ranking officials ultimately retrieved both of plaintiff's medical pillows -- Lt.

14   Fecht in October, and Lt. Brida in December.  Plaintiff's statement that he asked, without

15   success, other custody staff to retrieve his pillows,[18] lends additional support for defendant's

16   alleged deference to higher ranking officials.

17   For these reasons, the court finds no violation of plaintiff's Eighth Amendment

18   rights for the period October 22, 2009, to October 29, 2009.  Because Dr. Rohrer's first chrono

19   failed to specify that plaintiff should be given one of the medical pillows given him by Queen of

20   the Valley Hospital, defendant was reasonably justified in denying plaintiff's request.  Moreover,

21   absent specific authorization for retrieving one of plaintiff's pillows, pursuant to the subject

22   chrono or as directed by higher ranking staff, there is no basis for finding that defendant should

23

24   [18]  Plaintiff states, in his sworn opposition, that he "did try to obtain the 2 pillows from
     other custody staff and was told that he was not going to get involved.  It was C/O Sable.
25   Plaintiff also went to Lt. Fecht about the defendant taking plaintiff's 2 pillows."  (Oppo., Dkt.
     No. 49 at 3.)  Plaintiff asserts that this demonstrates he "did in fact try to obtain the pillows from
26   other custody staff."  (Id.)

1   have discerned any risk of harm to plaintiff by failing to do so.

2   　　　　The last relevant period for assessing plaintiff's Eighth Amendment claim is the

3   three-week period from November 25, 2009 (when plaintiff showed defendant Dr. Rohrer's

4   second chrono), and December 16, 2009 (when plaintiff obtained the second pillow through the

5   efforts of Lt. Brida).  Dr. Rohrer's second chrono specifically authorized plaintiff's possession of

6   both medical pillows given him by Queen of the Valley Hospital, that is, both pillows confiscated

7   by defendant on October 8, 2009.

8   　　　　In addition to the reasons set forth above, defendant emphasizes that he was not

9   uniquely authorized to retrieve plaintiff's pillows.  Defendant states that he never had sole

10   custody or control of the pillows, particularly after they were placed in storage.  (Dkt. No. 43 at

11   3.)  The record contains no evidence to refute these statements.  Moreover, even assuming that

12   defendant had some affirmative duty to retrieve plaintiff's second pillow, plaintiff has alleged no

13   facts upon which to reasonably infer that defendant knew that his failure to do so could result in a

14   substantial risk of serious harm to plaintiff.  On the contrary, when plaintiff showed defendant

15   Dr. Rohrer's second chrono, plaintiff had been using one of his medical pillows for a period of

16   twenty-seven days, and had been taking increased pain medication for a period of two weeks.

17   These facts countermine any inference that defendant's alleged refusal to provide plaintiff with

18   his second pillow created an "obvious" or reasonably inferred risk of substantial harm to

19   plaintiff, much less that defendant ignored such risk.

20   　　　　For these reasons, the court finds no violation of plaintiff's Eighth Amendment

21   rights for the period November 25, 2009, to December 16, 2009.  Although Dr. Rohrer's second

22   chrono was explicit in specifying that plaintiff should be given the second of his medical pillows

23   issued by Queen of the Valley Hospital, the record fails to support a finding that defendant was

24   required to execute the chrono on his own, without authorization or direction from a higher

25   ranking staff member, or that defendant knew that his failure to personally execute the chrono

26   could cause a significant risk of serious harm to plaintiff.  In light of all these circumstances, the

1  court finds that defendant's failure to respond to plaintiff's second chrono was both reasonable

2  and justified.  Farmer, supra, 511 U.S. at 844-45.

3          For these several reasons, the court finds that summary judgment should be

4  granted for defendant on plaintiff's Eighth Amendment claim.

5          3.  Qualified Immunity

6          Defendant contends, alternatively, that he is entitled to qualified immunity on

7  plaintiff's Eighth Amendment claim.  The first prerequisite for considering a defense of qualified

8  immunity is a determination, based on the facts alleged and viewed in the light most favorable to

9  plaintiff, whether defendant violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201

10  (2001). Where the facts do not state a claim for violation of a constitutional right, the court need

11  make no further inquiry.  Id.

12          Pursuant to the court's finding that plaintiff has failed to sustain the merits of his

13  Eighth Amendment claim against defendant, the court need not reach defendant's alternative

14  contention that he is entitled to qualified immunity.

15          C.  First Amendment Retaliation Claim

16          Plaintiff claims that defendant "confiscated Plaintiff's pillows out of reprisal

17  because of Plaintiff's exercise of Plaintiff's protected speech, in the forms of filing appeals on

18  defendant  . . . in violation of Plaintiff's First Amendment Rights." (Cmplt., Dkt. No. 1 at 8.)

19  Stated differently, plaintiff claims that defendant violated his right to be "free to express himself,

20  free to report misconduct when detected, free from harassment and retaliation for reporting

21  wrongdoing when detected and free to file grievances." (Id. at 12.)  Plaintiff also alleges that

22  "[t]he arbitrary and capricious actions of defendant . . . chilled the effect and exercise of

23  Plaintiff's First Amendment Rights.  The actions of defendant [] did not serve any penological

24  goal, nor were his actions tailored narrowly enough to achieve such goals.  Instead, the actions of

25  defendant [] were based on animus." (Id.)  More generally, plaintiff alleges that defendant

26  confiscated his pillows "for harassment and retaliation purposes." (Id. at 9; see also id. at 11.)  In

1    his opposition briefs, plaintiff emphasizes that his retaliation claim is largely based on

2    defendant's confiscation of plaintiff's pillows on October 8, 2009, allegedly in retaliation for

3    plaintiff's threats to file an inmate appeal challenging defendant's allegedly harassing directive

4    that plaintiff include his blankets in the volume assessment.

5           Defendant seeks summary judgment on this claim, primarily on the ground that

6    plaintiff has failed to demonstrate any direct link between defendant's confiscation of plaintiff's

7    pillows, and plaintiff's subsequently-filed inmate grievances.  The court recommends summary

8    judgment for defendant on this claim.

9           1. Legal Standards

10          To prevail on a claim for retaliation under the First Amendment, plaintiff must

11   demonstrate that, on a specified date, an individual state actor took adverse action against

12   plaintiff in retaliation for plaintiff's engagement in a constitutionally protected activity, and that

13   the adverse action did not reasonably advance a legitimate penological goal.  Rhodes v.

14   Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005); Rizzo v. Dawson, 778 F.2d 527, 531-32 (9th

15   Cir. 1985).  Plaintiff's evidence must establish a link between the challenged conduct and

16   defendant's allegedly retaliatory motive.  Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995).

17   Direct and tangible harm will support a First Amendment retaliation claim even without

18   demonstrating a chilling effect on the further exercise of a prisoner's First Amendment rights.

19   Rhodes, at 408 F.3d at 568 n.11.

20          2. Analysis

21          Plaintiff misapprehends the nature of a First Amendment retaliation claim.

22   Defendant contends, correctly, that the only two relevant inmate appeals filed by plaintiff were

23   commenced after defendant confiscated plaintiff's pillows, thus demonstrating that defendant

24   could not have been motivated at that time by retaliation against plaintiff for filing inmate

25   appeals.  In addition, the court has found no authority for finding an inmate's threat to file an

26   appeal "constitutionally protected conduct."  Similarly, plaintiff has not alleged any specific

1 causal connection between his filing of the appeals and defendant's subsequent refusal to release

2 the pillows.  Finally, even if plaintiff could demonstrate the first three elements of his retaliation

3 claim against defendant -- adverse action in retaliation for a constitutionally protected activity --

4 plaintiff cannot support the fourth element.  The court finds that defendant's challenged conduct

5 was both reasonable and justified by prison policy, thereby supporting the further finding that

6 defendant's conduct served a legitimate penological purpose.

7       Accordingly, the court finds that summary judgment should be granted for

8 defendant on plaintiff's First Amendment claim.

9 V.  <u>CONCLUSION</u>

10       For the foregoing reasons, IT IS HEREBY RECOMMENDED that defendant's

11 motion for summary judgment (Dkt. No. 40), be granted in its entirety in favor of defendant.

12       These findings and recommendations are submitted to the United States District

13 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

14 after being served with these findings and recommendations, any party may file written

15 objections with the court and serve a copy on all parties.  Such a document should be captioned

16 "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

17 objections shall be filed and served within 14 days after service of the objections.  The parties are

18 advised that failure to file objections within the specified time may waive the right to appeal the

19 District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

20 DATED:  January 24, 2013

21

22                                  

23                       KENDALL J. NEWMAN
                      UNITED STATES MAGISTRATE JUDGE

24 chris1786.msj

25

26