1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JON CHRIST,

11              Plaintiff,                    No. 2:10-cv-1786 LKK KJN P

12        vs.

13   S. DEBERRY, et al.,                      AMENDED[1]

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16        Plaintiff Jon Christ is a state prisoner, currently incarcerated at San Quentin State

17   Prison.  Plaintiff proceeds without counsel and in forma pauperis in this civil rights action filed

18   pursuant to 42 U.S.C. § 1983.  This case proceeds on plaintiff's original verified complaint (Dkt.

19   No. 1 at 5-13), against one defendant, Correctional Officer S. Deberry-Thornton.  Pending is

20   defendant's motion for summary judgment.  For the reasons that follow, this court recommends

21   that defendant's motion be granted in its entirety.

22   ////

23

24        [1]  These findings and recommendations are amended solely for the purpose of correctly
     citing current Federal Rule of Civil Procedure 56, which was revised and rearranged effective
25   December 10, 2010.  As stated in the Advisory Committee Notes to the 2010 Amendments to
     Rule 56, "[t]he standard for granting summary judgment remains unchanged."  Accordingly, the
26   legal analyses set forth herein remain unchanged.

I. Pertinent Filings

Defendant's motion for summary judgment (Dkt. No. 40) was filed in tandem with several supporting declarations (Dkt. Nos. 41-44). Plaintiff timely filed an opposition, and declared under penalty of perjury the truth of additional facts alleged therein (Dkt. No. 49); defendant filed a reply (Dkt. No. 51). Plaintiff thereafter filed a surreply (Dkt. No. 53), and a motion for the court to accept as evidence the sworn answers to interrogatories provided by plaintiff's witness, Mr. Pappas (Dkt. No. 52); the court granted plaintiff's motion (Dkt. No. 55). Thereafter, in light of the Ninth Circuit's holding in Woods v. Carey, 684 F.3d 934 (9th Cir. 2012) (mandating that pro se plaintiffs be provided notice of the requirements for opposing a motion for summary judgment, contemporaneous with the filing of the motion, as set forth in Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988), the court accorded plaintiff additional time to file a new or supplemental opposition to defendant's motion. (Dkt. No. 55.) On August 6, 2012, plaintiff filed a supplemental opposition. (Dkt. No. 57.) Defendant thereafter filed a notice that he would rely on his previously-filed reply (Dkt. No. 58), to which plaintiff objected (Dkt. No. 59).

Plaintiff objects to "Defendant's Notice of Intent To Rely on Previously-Filed Reply," on the ground that the Deputy Attorney General who signed the notice (Danielle F. O'Bannon) is not the same Deputy Attorney General who signed the reply (Trace. O. Maiorino). Plaintiff notes that this purported change in representation was accomplished without first obtaining leave of court, which plaintiff asserts was required.

The Local Rules provide in pertinent part:

> When an attorney is employed or retained by a . . . public entity, agency, or department . . . the attorney may participate in an action, without filing a substitution of attorneys, if another person employed or retained by the same law firm, organization, public entity, agency, or department is attorney of record in the action.

Local Rule 182(b). In the present action, both O'Bannon and Maiorino are attorneys working for

the California Attorney General's Office, and both remain attorneys of record in this case.  Thus, pursuant to Local Rule 182(b), Ms. O'Bannon did not require leave of court to sign the Notice filed August 16, 2012.  Accordingly, plaintiff's objections (Dkt. No. 59) to defendant's "Notice" (Dkt. No. 58) are overruled.

In an abundance of caution, and notwithstanding the court's prior admonitions (Dkt. No. 55 at 3), the court has construed all of plaintiff's other filings, after defendant filed his motion for summary judgment, as plaintiff's complete opposition to defendant's motion.  Due to plaintiff's pro se status, and the fact that each of the noted filings contains unique information or argument, the court has carefully reviewed each of plaintiff's arguments and all of his evidence in opposition to defendant's motion for summary judgment.  These filings include plaintiff's original opposition (Dkt. No. 49); plaintiff's surreply (Dkt. No. 53);[2] the sworn answers to interrogatories provided by plaintiff's witness, Mr. Pappas (Dkt. No. 52); and plaintiff's supplemental opposition (Dkt. No. 57).  In addition, the court has considered the allegations of plaintiff's verified complaint.  (Dkt. No. 1 at 5-13.)

II.  The Complaint

Plaintiff originally filed this action in the Santa Clara County Superior Court on March 5, 2010.  Sole defendant Deberry-Thornton (hereafter "defendant" or "Deberry"), through counsel, removed this action to federal court on June 9, 2010.  The case was transferred to this district court in July 2010.

The complaint alleges that defendant confiscated, and refused to return, plaintiff's two medical pillows that had been issued to him by Queen of the Valley Hospital following plaintiff's cervical spine surgery.  Plaintiff alleges that, without the pillows, he suffered loss of sleep, increased pain, and long-term injury.  Plaintiff alleges that he was compelled to seek the

---

[2]  Although the Local Rules do not provide for a surreply, see Local Rule 230(l), the unique posture of this case supports consideration of all plaintiff's filings in opposition to defendant's motion for summary judgment, including plaintiff's surreply.

1  return of his pillows by seeking medical authorizations, filing requests for disability

2  accommodation, and through the appeals process.  One pillow was re-issued 21 days after its

3  confiscation; the second pillow was re-issued after 69 days.  The complaint alleges First and

4  Eighth Amendment claims pursuant to the Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"),

5  and a Title II claim pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§

6  12132 et seq.  Plaintiff seeks $710,00.00 general damages, $785,000.00 compensatory damages,

7  $750,000.00 punitive damages, and undefined injunctive relief.

8         Defendant moves for summary judgment on each of plaintiff's claims.

9  III.  Legal Standards for Summary Judgment

10        Summary judgment is appropriate when it is demonstrated that the standard set

11  forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if

12  the movant shows that there is no genuine dispute as to any material fact and the movant is

13  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

14              Under summary judgment practice, the moving party always bears
             the initial responsibility of informing the district court of the basis
15           for its motion, and identifying those portions of "the pleadings,
             depositions, answers to interrogatories, and admissions on file,
16           together with the affidavits, if any," which it believes demonstrate
             the absence of a genuine issue of material fact.

17

18  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

19  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

20  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

21  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

22  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

23  Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

24  burden of production may rely on a showing that a party who does have the trial burden cannot

25  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

26  should be entered, after adequate time for discovery and upon motion, against a party who fails to

1  make a showing sufficient to establish the existence of an element essential to that party's case,

2  and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322.

3  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

4  necessarily renders all other facts immaterial." Id. at 323.

5          Consequently, if the moving party meets its initial responsibility, the burden then

6  shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

7  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

8  to establish the existence of such a factual dispute, the opposing party may not rely upon the

9  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

10 form of affidavits, and/or admissible discovery material in support of its contention that such a

11 dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

12 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

13 of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

14 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

15 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

16 return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

17 1436 (9th Cir. 1987).

18          In the endeavor to establish the existence of a factual dispute, the opposing party

19 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

20 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

21 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

22 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

23 genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

24 committee's note on 1963 amendments).

25          In resolving a summary judgment motion, the court examines the pleadings,

26 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

1  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

2  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

3  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

4  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

5  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

6  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

7  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

8  show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

9  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

10  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

11  III.  Facts

12          The following summary sets forth the relevant facts that are undisputed by the

13  parties or, following the court's review of the evidence, have been deemed undisputed for

14  purposes of the pending motion.  Disputed facts, where relevant, are also noted.

15          1.  The relevant events took place during plaintiff's incarceration at California

16  State Prison-Solano ("CSP-SOL"), under the authority of the California Department of

17  Corrections and Rehabilitation ("CDCR").

18          2.  In November 2008, while an inmate at CSP-SOL, plaintiff obtained surgical

19  fusion of vertebrae in his neck (C6-7) at Queen of the Valley Hospital, in Napa, California.  (See,

20  e.g., Dkt. No. 49 at 23-4.) When discharged from the hospital, plaintiff was provided two

21  medical pillows, which he was permitted to retain while housed in CSP-SOL's medical facility

22  (Building 16, Facility 3).  Although plaintiff was required to "log" the pillows at CSP-SOL's

23  medical facility, he was not required to have a medical "chrono," and his possession of the

24  pillows was not challenged.  (Pltf. Depo. at 30-31.)

25          3.  Nearly a year later, on October 8, 2009, plaintiff was moved from CSP-SOL's

26  medical facility to Building 15, Facility 3, a general population facility.  Pursuant to routine

procedure, defendant Deberry and another officer directed plaintiff to place all of his personal property in a container measuring six cubic feet in volume, in order to demonstrate compliance with CDCR's personal property limitations.

4. Defendant required that plaintiff place his medical pillows and state-issued blankets in the container, in addition to plaintiff's other property. The pillows, along with plaintiff's excess property, were later inventoried and placed in the property storage facility. (Deberry Decl., Dkt. No. 43, ¶¶ 6-8.) The process of going through all of plaintiff's property, to determine what items were authorized, took two to four days. (Pltf. Depo. at 65-6, 104-5.)

5. Plaintiff testified at his deposition that, when defendant insisted plaintiff place his blankets in the container, plaintiff informed defendant that he would challenge the matter through the inmate appeal process, allegedly stating, "'Well, then I'll have to file my grievance. I'll have to 602 you.'" (Id. at 65.) Plaintiff testified that defendant "got a little upset because I said I was going to 602 him." (Id.) Plaintiff further alleges that, when defendant disagreed with plaintiff about the property that plaintiff could keep and that which he would need to send home, plaintiff stated, "'Okay. I'll just file my appeal and let it go from there.'" (Id.)

6. Plaintiff also testified that, when defendant took his medical pillows, plaintiff "told him what they were for, [and] he said, if I show him a chrono, he'll give them back." (Id. at 22, 60.)

7. The next day, October 9, 2009, plaintiff obtained from his primary care physician, Dr. Jason Rohrer, a "Comprehensive Accommodation Chrono" (CDC Form 7410),[3] authorizing, under the form title "Medical Equipment/Supplies," that plaintiff have a "pillow" for a period of one year. The chrono does not contain any description of the authorized pillow. The

---

[3] A "Comprehensive Accommodation Chrono" (CDC Form 7410) is to be completed by prison health care staff to provide "for accommodations that are medically necessary or are required under the Americans with Disabilities Act (ADA)." California Correctional Health Care Services, Inmate Medical Services Policies and Procedures, Vol. 4, Ch. 23 (Comprehensive Accommodation Chrono), § I.

chrono was approved by the Chief Medical Officer ("CMO") on October 14, 2009.  (Pltf. Depo. at 45; Defense Exh. 2.)[4]

8.  Plaintiff testified that he showed defendant the chrono on October 22, 2009, and asked defendant for one of his pillows; defendant allegedly responded that, because the chrono had been written after the confiscation, plaintiff's doctor should issue a new medical pillow.  (Pltf. Depo. at 22, 55, 63-4; Dkt. No. 44-1 at 9.)  Plaintiff testified that, during this period, he also asked defendant "at least two or three times" for a regular CDCR-issued pillow, without receiving one.  (Pltf. Depo. at 46, 55.)

9.  Meanwhile, on October 12, 2009, plaintiff submitted an inmate appeal (Log No. CSP-S-09-02257), challenging defendant's confiscation and retention of several items of plaintiff's personal property, without reference to plaintiff's pillows.  Plaintiff requested that "all the property be held pending the outcome of this appeal," and "for this kind of harassment to stop."  (Dkt. No. 44-1 at 5.)

10.  Defendant reviewed plaintiff's appeal at the informal level, and returned it to plaintiff on October 29, 2009.  Defendant noted that plaintiff's personal property had exceeded policy limitations, and that he had given plaintiff an opportunity to select items that came within the allowable parameters.  (Id. at 5, 7.)  Defendant also noted that "[e]xcess property was confiscated, inventoried and placed in a secure location in Housing Unit #15 until a determination can be made for method of disposal by inmate Christ, per CCR 3191(c)."  (Id. at 7.)  There is no reference to plaintiff's pillows.

11.  This appeal (Log No. CSP-S-09-02257) was partially granted at the First and Second Levels, on the ground that plaintiff's property had been held pending the outcome of the appeal, and because plaintiff was permitted the opportunity to determine what property to

---

[4]  Curiously, the copy of this chrono attached to Dr. Rohrer's declaration reads "pillows" (plural.)  (Rohrer Decl., Exh. 1.)  However, Dr. Rohrer states that, pursuant to this chrono, he approved issuance of a "pillow" (singular).  (Rohrer Decl., ¶ 6.)

surrender in order to come within departmental limitations.  At both levels of review, plaintiff's

allegations of harassment were found unsubstantiated.[5]  Neither decision references plaintiff's

pillows.  The record fails to demonstrate that plaintiff exhausted this appeal through the

Director's Level.

            12.  On October 22, 2009, plaintiff filed a "Reasonable Modification or

Accommodation Request" (CDC Form 1824).  Plaintiff alleged that he was disabled under the

ADA due to his "C-Spine Surgery, Lower Back pain, with hip pain, Post-Gun Shot wound right

femur." (Dkt. No. 44-1 at 38.)  Plaintiff complained that defendant had confiscated plaintiff's

two "soft pillows" that had been given to plaintiff post-surgically, and refused to return them

despite plaintiff showing defendant Dr. Rohrer's October 9, 2009 chrono.[6]  Plaintiff sought the

return of both pillows, and "for this kind of harassment by C/O DeBerry to cease against myself

ASAP."

////

_____

[5]  Pursuant to the First Level Response, plaintiff was interviewed by Correctional
Sergeant Alexander, on November 22, 2009, who determined in pertinent part that "appellant's
allegations of harassment were unfounded as the appellant was unable to provide any
substantiating evidence on his behalf that would lead the reviewer to such a conclusion." (Dkt.
No. 44-1 at 9.)  Pursuant to the Second Level Response, issued by the CSP-SOL Warden on
February 2, 2010, it was noted that "[a]lthough the appellant's property in total would fit within
the allowable six cubic feet, the fact that he was in possession of more tha[n] the allowable
amount of several of these items justifies the confiscation of excess items by CO Deberry." (Id.
at 4.)  As in the Second Level Response, the Warden found that plaintiff's allegations of
harassment by defendant were "unfounded," and that the appeal was "appropriately categorized
as a property issue and not a staff complaint matter."  (Id.)

[6]  Plaintiff fully described the problem in support of his October 22, 2009 (CDC Form
1824) request as follows (Dkt. No. 44-1 at 38):

        On Nov. 24, 2008 I had surgery and fusion at C6-7.  On 10-8-09 I was moved
        from building 16-22L to building 15-H-6L.  I had (2) soft pillows that came with
        me from Queen of the Valley after C-spine surgery.  C/O DeBerry took both my
        pillows and said when you find your chrono from them just bring them up to me
        and I will give you them back.  On 10-22-09 I showed C/O DeBerry my chrono
        for them and he now states "well I took your pillows on 10-08-09 and the chrono
        is written on 10-09-09. So you cannot have them back. Dr. Jason Rohrer wrote
        this chrono because I need those soft pillows because of the pain that I have in my
        neck.  Getting worse.

13.  On October 27, 2009, plaintiff was interviewed by Lt. J. S. Fecht, who apparently "sent a sergeant over" to retrieve one of plaintiff's pillows.  (Pltf. Depo. at 22.)  When plaintiff returned to his bunk on October 29, 2009, the pillow was there.  (Id. at 57.)  On November 2, 2009, plaintiff signed the dispositional portion of Lt. Fecht's decision, which provided in full:  "As stated above the appellant recieved (sic) (1) pillow on 10-29-09 upon verification of his chrono.  At this time the appellant is in agreement with the action taken and he is in possession of (1) pillow."  (Dkt. No. 44-1 at 39.)  This disposition was approved by the Associate Warden on November 9, 2009, and the form was returned to plaintiff on November 10, 2009.  (Id.)

14.  Plaintiff's October 22, 2009 (CDC Form 1824) request was later designated an inmate appeal, and assigned Log No. CSP-S-09-02157; pursuant to Lt. Fecht's resolution noted above, the appeal was deemed partially granted at the First Level Review.  (Id. at 32.)

15.  On November 12, 2009, plaintiff saw Dr. Rohrer for complaints of increased neck pain.  Dr. Rohrer increased plaintiff's pain medication, and signed a second Comprehensive Accommodation Chrono (CDC Form 7410), which provided in full:  "Inmate should be allowed to possess the two orthopedic pillows issued to him from Queen of the Valley Hospital status post neck surgery x one year."  (Dkt. No. 44-2 at 1; see also Pltf. Depo. at 24, 46-48; Defense Exh. 3)  Plaintiff testified that Dr. Rohrer, when signing the second chrono, stated that the first chrono "'was supposed to be for both pillows, because that's what the hospital sent with you.'"  (Pltf. Depo. at 45.)  The second chrono was approved by the CMO on November 18, 2009.

16.  Plaintiff allegedly showed defendant the second chrono on November 25, 2009; however, defendant allegedly refused to provide plaintiff with his second pillow, and told plaintiff to see Lt. Fecht or have his doctor issue another pillow.  (Dkt. No. 41-1 at 25; Pltf. Depo. at 50, 52.)  Plaintiff testified that, after receiving the second chrono, he asked defendant "at least twice" for his second pillow.  (Pltf. Depo. at 51, 52.)

////

1          17.  On November 26, 2009, plaintiff submitted another CDC Form 1824, which

2  staff determined was duplicative of plaintiff's initial CDC Form 1824.  Plaintiff was advised to

3  submit a CDC Form 602 requesting Second Level Review of his initial CDC Form 1824 (Log

4  No. CSP-S-09-02157).

5          18.  On December 2, 2009, plaintiff requested Second Level Review of his appeal

6  (Log No. CSP-S-09-02157), alleging that, on November 25, 2009, he had shown defendant the

7  second chrono issued by Dr. Rohrer, but defendant had refused to provide plaintiff with his

8  second pillow, allegedly stating, "'go see Lt. Fecht,'" and "have your doctor issue you another

9  pillow, if he wants you to have (2) pillows."  (Dkt. No. 44-1 at 34.)  Plaintiff stated that his neck

10  pain had worsened; he requested immediate cessation of harassment by defendant and the return

11  of both his medical pillows.  (Id. at 31.)

12          19.  Pursuant to the Second Level Review of plaintiff's appeal, issued December

13  16, 2009, Lt. D. Brida noted that he had contacted plaintiff on the same date, and plaintiff was

14  then in possession of both pillows.  (Id. at 25.)  Hence, plaintiff's appeal, requesting the return of

15  both pillows, and for cessation of the alleged harassment by defendant, was granted.  (Id. at 32.)

16          20.  On February 20, 2010, a Director's Level Decision was rendered by the

17  Appeals Examiner, denying plaintiff's inmate appeal (Log No. CSP-S-09-02157).  The Appeals

18  Examiner noted plaintiff's allegations against defendant, but found "that staff acted

19  appropriately."  (Dkt. No. 44-1 at 26.)  The Examiner relied on Dr. Rohrer's Comprehensive

20  Accommodation Chronos (CDC Form 1740) to find that plaintiff's pillows were "medically

21  necessary" within the meaning of 15 C.C.R. 3350(b)(1), but found, because plaintiff had

22  obtained his pillows, that no additional accommodation was warranted.  (Id. at 26.)

23          21.  On March 5, 2010, plaintiff filed the underlying complaint in Santa Clara

24  County Superior Court.  On June 9, 2012, defendant, through counsel, removed this action to

25  federal court; the case was transferred to this district in July 2010.  This action proceeds on

26  plaintiff's original complaint, pursuant to plaintiff's claims that defendant confiscated and

1   retained plaintiff's pillows in violation of plaintiff's rights under the Eighth Amendment and the

2   Americans with Disabilities Act, and in retaliation for plaintiff's exercise of his First

3   Amendment rights.

4           22.  Plaintiff testified that, prior to October 8, 2009, he did not know defendant

5   DeBerry and had not had any personal contact with him.  (Pltf. Depo. at 27.)  Plaintiff also

6   testified that, after he obtained both of his pillows, he had no further relevant contact with

7   defendant,[7] because, approximately two months thereafter, plaintiff was sent to administrative

8   segregation and thereafter transferred to Avenal State Prison.  (Id. at 38, 51, 54, 113.)

9           23.  The complaint alleges that, as a result of the confiscation of his pillows,

10  plaintiff "suffered numerous sleepless and painful nights and days for 21 days before the first

11  pillow was re-issued, and approximately 69 days for the 2nd pillow to be re-issued. . . ."  (Cmplt.,

12  Dkt. No. 1 at 9.)  The complaint states that plaintiff's "physician increased Plaintiff's pain

13  medications because of Plaintiff being forced to sleep absent the two pillows."  (Id.)  Plaintiff

14  testified that, for the first thirty nights following the confiscation of his pillows, he experienced

15  severe pain in his neck, particularly at night, and got little sleep.  (Pltf. Depo. at 66-71.)  Plaintiff

16  stated that the pillows are most effective when used in tandem.  (Id. at 102-3, 108-12.)  Without

17  either pillow, plaintiff attempted to use rolled-up clothing items and towels in an effort to create

18  a pillow, but this alternative was not effective.  (Id. at 103-5.)

19          24.  Plaintiff testified that, while his pain decreased some with increased

20  medications in November 2009, his neck still bothers him more now than when he was moved to

21  CSP-SOL's Building 15, including pain radiating down his back.  Plaintiff also has headaches.

22  (Id. at 70, 74, 76-8.)  Plaintiff opined that "due to not having my pillows at a crucial healing

23

24          [7]  Plaintiff testified that he pursued a subsequent inmate appeal against defendant,
    alleging that, after defendant failed to respond to plaintiff's second chrono, defendant also
25  refused to sign plaintiff's legal mail.  (Pltf. Depo. at 52-3, 66.)  However, at his deposition,
    plaintiff agreed with defense counsel that his challenges against defendant regarding the
26  processing of plaintiff's legal mail are not part of the present action.  (See id. at 14, 18, 53.)

1  point, [my neck] didn't heal right," and that, "if I would have had my pillows during that period

2  of time I wouldn't have the problems I'm going through now." (Id. at 70, 71.)  Plaintiff testified

3  that, in 2011, he was seen by a surgeon who opined that plaintiff's continuing wrist pain, despite

4  carpal tunnel surgery, could be attributable to his neck problems.  (Id. at 71-74, 93, 96, 113.)

5  Plaintiff described current neck pain that radiates to his shoulder and right hand, and a sharp pain

6  in his right wrist, causing numbness and tingling in his right hand.  (Id. at 75.)  Plaintiff testified

7  that, during his most severe pain, he lost appetite, declined family visits and telephone calls, and

8  missed work and yard time.  (Id. at 74, 81-3, 89-90.)

9       25.  In a verified declaration filed January 17, 2012,[8] defendant DeBerry avers as

10  follows (Dkt. No. 43 at 1-4):

11       (a)  Defendant has worked continuously at CSP-SOL since October 2002.

12       (b)  During the relevant period, at least 17 CDCR employees were assigned to

13  work at CSP-SOL's Building 15 within each 24-hour period.

14       (c)  "[I]n accordance with Department Operations Manual, Section 54030.4,

15  prison policy provides that the combined volume of state-issued and allowable personal property

16  items of an inmate in general population shall not exceed six cubic feet excluding designated

17  work clothing and work shoes.  Moreover, Section 54030.4 provides that in addition to the six

18  cubic feet of property, an inmate may possess [only] two of the following: television set, radio,

19  tape/record recorder, typewriter, musical instrument, or a tv/radio/tape player combination unit."

20

21  [8] Plaintiff objects to the fact that defendant failed to specify the date in January 2012
when he signed his declaration.  (See Dkt. No. 49 at 14.)  The declaration provides in pertinent

22  part that defendant affixed his signature thereto, under penalty of perjury, on "January ___,
2012." (Dkt. No. 43 at 4.)  The declaration was filed on January 17, 2012.  While a declaration,

23  to be valid, must provide the date of signing, see 28 U.S.C. § 1746, the court finds that defendant
substantially complied with this requirement.  Defendant necessarily signed his declaration

24  sometime between January 1 and January 17, 2012, and the declaration was timely filed in
support of defendant's motion for summary judgment.  Due to this narrow time frame, and the

25  lack of prejudice to plaintiff (the contents of the declaration address matters that occurred in
2009), plaintiff's objection is overruled.  Accord Manriquez v. Huchins, 2012 WL 5880431 at *3

26  (E.D. Cal. 2012) (finding substantial compliance with requirement that verified discovery
responses include date of execution, given limited time frame within which signing occurred).

-13-

1    (d) "Christ was transferred to Building 15 on or about October 8, 2009.  I do not

2    recall having any contact with Christ before October 8, 2009.  After he was transferred to

3    Building 15, I inspected and searched Christ's property before he was assigned to his cell[9] in

4    accordance with prison policy.  I conducted this inspection with Officer Tambini.  I recall that

5    Christ had more property than was allowed by the prison rules.  As such, we were obligated to

6    limit the amount of property he kept in his new cell in Building 15.  The property that did not

7    remain in his possession was inventoried and placed inside the property storage facility in

8    Building 15. . . . Christ's excess property was inventoried and the chronos were completed by

9    another officer.  I did not complete the chronos itemizing the property confiscated from Christ

10    and stored in the property storage facility."

11    (e)  Plaintiff's inventoried and stored property included "two pillows.  Christ

12    stated that the pillows were provided to him by a non-CDCR hospital.  Christ did not have a

13    medical chrono, or other documentation, for the two pillows.  Prison policy, including Section

14    54030.4, provides that an inmate shall possess only the amount of property that is specifically

15    authorized.  As such, under prison policy, he was not permitted to retain these pillows without a

16    chrono or other documentation.  In accordance with prison policy, the two pillows were placed

17    inside the property storage facility."

18    (f)  "I understand that Christ has alleged that I confiscated his two pillows in

19    retaliation for inmate appeals he filed against me.  However, at no time did I confiscate his two

20    pillows in retaliation for an inmate appeal filed against me.  In fact, at the time the pillows were

21    removed from Christ's custody, I was not aware of any inmate appeal he may have filed against

22    me."

23    (g)  "Once removed from [plaintiff's] possession, the two medical pillows were

24    placed in the property storage facility.  As such, I was not in possession of Christ's two medical

---

[9] Plaintiff states that, where he was housed, there "are no cells . . . only dorms."  (Dkt.
No. 49 at 13.)

-14-

pillows after October 8, 2009.  Moreover, at no time did I have sole custody or control of the two

medical pillows.  Christ had multiple options for retrieving or replacing his two medical pillows.

Christ could have contacted one of the other sixteen CDCR employees assigned to work in his

housing unit, he could have obtained medical pillows through the CSP-Solano medical

department, or he could have completed the appeals process."

(h) "At the time the two pillows were placed in the property storage facility, I

understood that prison policy would not permit Christ to retrieve the two pillows because they

were not issued by CDCR.  I understand that prison policy would require the inmate to request

that the medical department issue him two replacement medical pillows or have a higher ranking

correctional staff member grant him permission to obtain the two medical pillows that were

confiscated."

(i)  "In a prison setting, property is strictly maintained to secure the safety of

prison inmates and employees.  Property that is not issued by CDCR may be used to conceal or

transport contraband such as weapons, narcotics, or other materials not permitted in the prison.

As such, as a correctional officer I did not believe that I had the authority to return the two

pillows to Christ because it would have presented a potential security risk since the source of the

pillows could not be traced for certain[,] [p]articularly since Christ did not possess a chrono, or

other documentation, showing that the two medical pillows had been issued by CDCR or another

entity."

26. Dr. Rohrer, who has worked as a physician at CSP-SOL since January 2002,

filed a verified declaration, dated January 12, 2012, that provides as follows (Dkt. No. 41 at 1-3):

(a) Dr. Rohrer was plaintiff's primary care physician when plaintiff had cervical

spine surgery in November 2008.

(b) Generally, it takes a patient approximately six weeks to recover from cervical

spine surgery.

(c) Plaintiff had likely "fully healed" from his cervical spine surgery by October

2009.

(d)  On October 9, 2009, Dr. Rohrer issued a Comprehensive Accommodation Chrono providing plaintiff with a pillow for a period of one year.

(e)  On November 12, 2009, Dr. Rohrer issued another Comprehensive Accommodation Chrono authorizing plaintiff's possession of "the two orthopedic pillows issued to him from Queen of the Valley Hospital status post neck surgery x one year."

(f)  Dr. Rohrer stated that he "issued the chronos because Christ requested them -- not because they were medically necessary.  Although not medically necessary, I issued the chronos as a means to possibly provide Christ with more comfort -- physical or psychological -- and convenience."

27.  Dr. Robert Chapnick, CMO at Avenal State Prison, where plaintiff was transferred in September 2010 (Pltf. Depo. at 10), reviewed plaintiff's Unit Health Record ("UHR"), and filed a verified declaration, dated January 11, 2012, that provides as follows (Dkt. No. 42 at 1-3):

(a)  Plaintiff's cervical spine surgery was performed on November 24, 2008, at Queen of the Valley Hospital, a non-CDCR hospital, by Dr. Jason Huffman, whose discharge summary did not recommend medical pillows.

(b)  Plaintiff was subsequently seen by neurosurgeon Dr. Moris Seneger, whose consultation notes did not recommend medical pillows.

(c)  Review of plaintiff's UHR did not reveal "any documentation that [plaintiff] was ever prescribed medical pillows or that he ever requested a medical pillow prescription."

(d)  The only relevant documentation in plaintiff's UHR were Dr. Rohrer's chronos issued October 9, 2009, and November 12, 2009.

(e)  Based on this review, Dr. Chapnick concluded that there is no basis in plaintiff's medical records to support plaintiff's allegation that the two subject pillows were medically necessary.

1    (f)  Moreover, Dr. Chapnick "found no indication that the medical pillows were

2    needed for [plaintiff] to perform his Activities of Daily Living within the meaning of the

3    Americans with Disabilities Act (ADA)."

4    28.  One of plaintiff's witnesses, inmate Phil Pappas, is deceased.  Pursuant to the

5    court's order filed July 16, 2012, Mr. Pappas' answers to plaintiff's interrogatories have been

6    deemed admissible evidence in opposition to defendants' motion for summary judgment.[10]  Fed.

7    R. Civ. P. 56(c)(1)(A).  (Dkt. No. 55.)  Plaintiff testified that Mr. Pappas was present when

8    plaintiff "first moved into the building," when defendant took plaintiff's pillows, and when

9    plaintiff packed up his property.  Every time that plaintiff subsequently went through his

10   property, he was accompanied by Mr. Pappas.  (Pltf. Depo. at 99-100.)  In his verified answers to

11   plaintiff's interrogatories, signed May 12, 2011, Mr. Pappas stated in pertinent part that

12   defendant confiscated plaintiff's medical pillows on October 8, 2009, and that Mr. Pappas

13   assisted plaintiff with paperwork to retrieve his pillows.  Mr. Pappas opined that defendant

14   harassed plaintiff by requiring plaintiff to place his two state-issued blankets inside the property

15   container.[11]  (Dkt. No. 52.)

16

17   [10]  As previously stated, the undersigned states no opinion on the admissibility of this
     evidence should this case proceed to trial, in which case plaintiff must raise the issue anew before
18   the trial judge.

19   [11]  Given their brevity, the court recites each of plaintiff's interrogatories and Mr. Pappas'
     answers thereto (set forth in Dkt. No. 53 at 4-7).  References to plaintiff's legal mail are not part
20   of this action.  (See n.6, supra.)

21   Question 1:  On October 8, 2009, did you see Correctional Officer S. DeBerry
     confiscate Plaintiff's (2) two medical pillows from him, when plaintiff moved into
     building 15, CSP-Solano, 2100 Peabody Rd. Vacaville, CA 95696?
22   Answer:  Yes.

23   Question 2:  Did you help plaintiff get his medical pillows back by paperwork i.e.
     . . (602, ADA Appeals)?
24   Answer:  Yes.

25   Question 3:  After plaintiff filed his appeal against C/O DeBerry, did you know of
     a time when C/O DeBerry refused to sign plaintiff's outgoing legal mail?
26   Answer:  Yes, directly thereafter per filing [illegible] appeal.

IV.  DISCUSSION

    A.  Americans with Disabilities Act Claim

        Plaintiff claims that defendant's confiscation and alleged retention of his medical pillows violated plaintiff's rights under the Americans with Disabilities Act.[12]  Defendant moves for summary judgment on this claim, on the ground that the record fails to demonstrate that plaintiff had a qualifying disability.  For the reasons that follow, the court recommends that summary judgment be granted for defendant on this claim.

    1.  Legal Standards

        Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The ADA applies to inmates and parolees in the state correctional system.  Armstrong v. Wilson, 124 F.3d 1019, 1022-24 (9th Cir. 1997).

////

---

Question 4:  Do you know the reason why C/O DeBerry would not sign plaintiff's outgoing legal mail?
Answer:  Yes, C/O DeBerry said he didn't want to go against staff or himself.

Question 5:  Did you see defendant DeBerry going through all of plaintiff's personal property, and did you see plaintiff putting his (2) two state issued wool blankets inside the 6 cubic foot cart?
Answer:  Yes.

Question 6:  Did you find out the reason plaintiff put his (2) two state issued blankets inside the 6 cubic foot car?
Answer:  Yes.  To harass inmate Christ (via Warden's 602 response).

Question 7:  Did you know that defendant DeBerry was harassing plaintiff?
Answer:  Yes.

[12]  On screening, based on a liberal construction of the complaint, the court found that "[p]laintiff's claim that Deberry improperly confiscated plaintiff's medical pillows may state a potentially cognizable ADA claim based on plaintiff's implicit contention that he was denied access to reasonable bedding materials by reason of his disability."  (Dkt. No. 18 at 5.)

1    An individual has a "disability" within the meaning of Title II of the ADA if he

2    has "(A) a physical or mental impairment that substantially limits one or more major life

3    activities of such individual; (B) a record of such an impairment; or (c) [are] regarded as having

4    such an impairment . . . ."[13]  42 U.S.C. § 12102(1).  To prevail on a claim of disability

5    discrimination under Title II, a plaintiff must demonstrate that:  "(1) the plaintiff is an individual

6    with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of

7    some public entity's services, programs, or activities; (3) the plaintiff was either excluded from

8    participation in or denied the benefits of the public entity's services, programs, or activities, or

9    was otherwise discriminated against by the public entity; and (4) such exclusion, denial of

10   benefits, or discrimination was by reason of the plaintiff's disability."  Thompson v. Davis, 295

11   F.3d 890, 895 (9th Cir. 2002), cert. denied, 538 U.S. 921 (2003) (citing Weinreich v. L.A.

12   County Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997).

13        2.  Analysis

14   The proper defendant in a Title II claim is the public entity allegedly responsible

15   for the discrimination.  "Public entities" include state prisons.  Pennsylvania Dept. of Corrections

16   v. Yeskey, 524 U.S. 206, 210 (1998).  Therefore, for present purposes, and despite defendant's

17   lack of a supervisory role, the court construes plaintiff's Title II claim against defendant in his

18   official capacity only.  See e.g. Miranda B. v. Kitzhaber, 328 F.3d 1181, 1187-88 (9th Cir. 2003).

19   ////

20   ////

21

22        [13]  "Major life activities" include, but are not limited to, "caring for oneself, performing
     manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking,
23   breathing, learning, reading, concentrating, thinking, communicating, and working."  Id., §
     12102(2)(B).  "An individual meets the requirement of 'being regarded as having such an
24   impairment' if the individual establishes that he or she has been subjected to an action prohibited
     under this chapter because of an actual or perceived physical or mental impairment whether or
25   not the impairment limits or is perceived to limit a major life activity."  Id., § 12102(3)(A).
     However, an individual may not be "regarded as having such an impairment" if the impairment is
26   "transitory and minor," a transitory impairment defined as "an impairment with an actual or
     expected duration of 6 months or less."  Id., § 12102(3)(B).

1          Even assuming that plaintiff's neck pain could reasonably be construed as a

2   "disability" within the meaning of the ADA,[14] plaintiff has failed to present any evidence to

3   support the remaining elements of this claim.  The ADA is designed to challenge the denial of a

4   benefit or service accorded similarly situated individuals -- i.e., discrimination -- "by reason of"

5   the plaintiff's disability.  The premise of plaintiff's complaint is that his neck pain entitled him to

6   possession of medical pillows, not that he was denied medical pillows "by reason of" his neck

7   pain.  It is axiomatic that "a plaintiff proceeding under Title II of the ADA must . . . prove that

8   the exclusion from participation in the program was 'solely by reason of disability.'"  Does 1-5 v.

9   Chandler, 83 F.3d 1150, 1155 (9th Cir. 1996) (quoting Sandison v. Michigan High School

10  Athletic Ass'n, Inc., 64 F.3d 1026, 1036-37 (6th Cir. 1995) (plaintiffs barred from participating

11  in high school athletics by reason of their age, not their disability); accord Weinreich v. Los

12  Angeles County Metropolitan Transp. Authority, 114 F.3d 976, 978-79 (9th Cir. 1997) (plaintiff

13  excluded from financial assistance program "due to his financial circumstances, not to his

14  medical disability").  Morever, as earlier noted, Dr. Chapnick opined, after reviewing all of

15  plaintiff's medical records, that the subject pillows were not needed to enable plaintiff to perform

16  "activities of daily living," within the meaning of the ADA.  (Dkt. No. 42 at 2-3.)

17          Accordingly, as there is no relevant triable issue of fact, the court finds that

18  defendant is entitled to summary judgment on plaintiff's ADA claim as a matter of law.

19      B.  Eighth Amendment Claim

20          Plaintiff claims that defendant's confiscation and alleged retention of his medical

21  pillows constituted deliberate indifference to plaintiff's serious medical needs in violation of the

22  Eighth Amendment.  Defendant moves for summary judgment on the ground that plaintiff's

23

24          [14]  There remains a threshold issue whether plaintiff's neck pain (as well as his other
    alleged disabilities (lower back, hip pain, and healed right femur wound)) can reasonably be
25  construed as a qualifying "disability" within the meaning of the ADA.  The only medical opinion
    of record is that of Dr. Chapnick, who found that plaintiff's medical records do not support such
26  a finding.  (Dkt. No. 42 at 2-3.)

1    alleged harm was not "sufficiently serious" to trigger Eighth Amendment protections; defendant

2    also contends that his challenged conduct was consistent with prison rules, and not motivated by

3    an intent to harm plaintiff.  Defendant also relies on these arguments to assert, alternatively, that

4    his challenged conduct is subject to qualified immunity.  For the reasons that follow, the court

5    recommends summary judgment on plaintiff's Eighth Amendment claim.

6             1.  Legal Standards

7             To establish deliberate indifference, a plaintiff must show that the defendant knew

8    of, and disregarded, an excessive risk to plaintiff's health or safety.  Farmer v. Brennan, 511 U.S.

9    825, 837 (1994).  "In the Ninth Circuit, the test for deliberate indifference consists of two parts.

10   First, the plaintiff must show a serious medical need by demonstrating that failure to treat a

11   prisoner's condition could result in further significant injury or the unnecessary and wanton

12   infliction of pain.  Second, the plaintiff must show the defendant's response to the need was

13   deliberately indifferent.  This second prong . . . is satisfied by showing (a) a purposeful act or

14   failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the

15   indifference."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations,

16   punctuation and quotation marks omitted).  Stated differently, a finding of deliberate indifference

17   requires proof of the following objective and subjective factors:

18              [A]n inmate seeking to prove an Eighth Amendment violation
                must "objectively show that he was deprived of something
19              'sufficiently serious,'" and "make a subjective showing that the
                deprivation occurred with deliberate indifference to the inmate's
20              health or safety."  [Foster v. Runnels, 554 F.3d 807 (9th Cir.
                2009)] at 812 (quoting Farmer v. Brennan, 511 U.S. 825, 834
21              (1994)).  The second step, showing "deliberate indifference,"
                involves a two part inquiry.  First, the inmate must show that the
22              prison officials were aware of a "substantial risk of serious harm"
                to an inmate's health or safety.  Farmer, 511 U.S. at 837.  This part
23              of our inquiry may be satisfied if the inmate shows that the risk
                posed by the deprivation is obvious.  See id. at 842 ("[A] factfinder
24              may conclude that a prison official knew of a substantial risk [to a
                prisoner's health] from the very fact that the risk was obvious.").
25              Second, the inmate must show that the prison officials had no
                "reasonable" justification for the deprivation, in spite of that risk.
26              See id. at 844 ("[P]rison officials who actually knew of a

                                        -21-

1    substantial risk to inmate health or safety may be found free from
     liability if they responded reasonably.").
2

3    Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010); see also Wilson v. Seiter, 501 U.S.

4    294, 298 (1991).

5           Prisons officials defending a deliberate indifference claim may avoid liability by

6    demonstrating "that they did not know of the underlying facts indicating a sufficiently substantial

7    danger and that they were therefore unaware of a danger, or that they knew the underlying facts

8    but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or

9    nonexistent." Farmer, supra, 511 U.S. at 844.  Thus, a prison official may also avoid liability by

10   presenting evidence that he lacked knowledge of the risk, and/or that his response was reasonable

11   in light of all the circumstances.  Id. at 844-45.

12          2.  Analysis

13          a.  Serious Medical Need

14          "Serious medical needs" include medical conditions that cause substantial and

15   chronic pain.  Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases).  A

16   "serious" medical need exists if the failure to treat a prisoner's condition could result in further

17   significant injury or the "unnecessary and wanton infliction of pain."  McGuckin, supra, 974 F.2d

18   at 1059 (citing Estelle, 429 U.S. at 104).  "[S]erious medical needs" include conditions that a

19   reasonable doctor would find worthy of comment or treatment, that significantly impact the

20   inmate's daily activities, or that cause chronic and substantial pain.  Id. at 1059–60 (citing Wood,

21   900 F.2d at 1337–41).

22          Viewing the evidence in the light most favorable to plaintiff, solely for purposes

23   of summary judgment, the court finds that plaintiff's post-surgical neck condition and pain

24   during the relevant period constituted a "serious medical need" under the Eighth Amendment.

25   ////

26   ////

b. <u>Seriousness of Deprivation</u>

Defendant contends that plaintiff's lack of access to his medical pillows was, objectively, not a "sufficiently serious deprivation" to trigger Eighth Amendment protections, because plaintiff's pillows were not "medically necessary." Plaintiff responds that his continuous possession of both pillows was medically necessary, because their deprivation caused plaintiff pain and discomfort, and interfered with the healing process following his cervical surgery, as demonstrated by the exacerbation of plaintiff's neck, wrist and back problems.

In determining whether a deprivation is "sufficiently serious" within the meaning of the Eighth Amendment, the court must consider "the circumstances, nature, and duration" of the deprivation. <u>Johnson v. Lewis</u>, 217 F.3d 726, 731 (9th Cir. 2000). "Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." <u>Johnson v. Lewis</u>, 217 F.3d 726, 731 (9th Cir. 2000) (citations omitted). "The more basic the need, the shorter the time it can be withheld." <u>Hoptowit v. Ray</u>, 682 F.2d 1237, 1259 (9th Cir.1982). "More modest deprivations can also form the objective basis of a violation, but only if such deprivations are lengthy or ongoing." <u>Johnson</u>, 217 F.3d at 731 (citation omitted).

The objective evidence of record in support of plaintiff's assertion that his pillows were "medically necessary" is limited to the following: (1) Dr. Rohrer's second Comprehensive Accommodation Chrono (CDC Form 7410),[15] approved by the CMO on November 18, 2009, which specifically authorized plaintiff's possession of both medical pillows provided by Queen

---

[15]   As earlier noted, a Comprehensive Accommodation Chrono (CDC Form 7410), is expressly intended for the purpose of authorizing inmate accommodations that are either "medically necessary" or otherwise required under the ADA. California Correctional Health Care Services, Inmate Medical Services Policies and Procedures, Vol. 4, Ch. 23 (Comprehensive Accommodation Chrono), § I. (<u>See</u> n.3, <u>supra</u>.) Department regulations define "medically necessary" accommodations as "health care services that are determined by the attending physician to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data as being effective medical care." 15 C.C.R. § 3350(b)(1). "Severe pain" is defined as "a degree of discomfort that significantly disables the patient from reasonable independent function." <u>Id.</u>, § 3350(b)(4).

1   of the Valley Hospital;[16] and (2) the February 20, 2010, Director's Level Decision on plaintiff's

2   pertinent inmate appeal (Log No. CSP-S-09-02157), wherein the Appeals Examiner expressly

3   found that the November 18, 2009 approval of Dr. Rohrer's second chrono supported a finding

4   that plaintiff's pillows were "medically necessary."  (Dkt. No. 44-1 at 26.)

5              These limited findings of medical necessity are undermined by the remainder of

6   the record.  Dr. Rohrer, who was plaintiff's primary care physician during the relevant period,

7   refuted any finding of "medical necessity" in his January 2012 declaration.  Dr. Rohrer explained

8   that he "issued the chronos because Christ requested them -- not because they were medically

9   necessary.  Although not medically necessary, I issued the chronos as a means to possibly

10  provide Christ with more comfort -- physical or psychological -- and convenience."  (Dkt. No. 41

11  at 3.)  Dr. Rohrer further opined that, because it normally takes a patient six weeks to recover

12  from the type of cervical surgery plaintiff received, it is likely that plaintiff was "fully healed"

13  during the pertinent time period in this action (eleven to twelve months after plaintiff's surgery).

14  (Id. at 2.)

15             Plaintiff's evidence is also undermined by the medical opinion of Dr. Chapnick,

16  Avenal State Prison CMO.  Pursuant to his review of plaintiff's medical records, Dr. Chapnick

17  found that neither plaintiff's surgeon (Dr. Huffman), nor the neurosurgeon who evaluated

18  plaintiff post-surgically (Dr. Seneger), prescribed or recommended medical pillows for plaintiff.

19  (Dkt. No. 42 at 2.)  Dr. Chapnick opined that there is no evidence in plaintiff's medical records to

20  support a finding that his possession of the subject pillows was medically necessary; rather, Dr.

21  Chapnick concurred with Dr. Rohrer that the pillows were authorized only for the purpose of

22  providing plaintiff additional comfort.  (Id.).

23             Plaintiff has submitted additional evidence, dated subsequent to the relevant

24  period, which he asserts supports a finding of medical necessity.  Plaintiff testified that he was

25

26       [16]  Dr. Rohrer's first chrono, authorizing only a "pillow," though set forth on a CDC Form 1740, was too general to support a finding of medical necessity.

1  issued a "replacement cervical pillow" in November 2010, while housed at Avenal State Prison.

2  (Pltf. Depo. at 106-7; see also Dkt. No. 49 at 26.)  In addition, a Medical Classification Chrono,

3  dated June 2011, accords plaintiff permanent "limited duty" status based, in part, on his neck

4  problems.  (Dkt. No. 49 at 19-20.)  Plaintiff has also submitted several records documenting his

5  wrist and low back pain, including a December 27, 2011 consultation recommending lumbar

6  surgery.  (Id. at 16-18; see also id. at 19-22, 25.)  While this new evidence appears to

7  demonstrate that plaintiff has had some continuing neck problems, the court finds that it is not

8  probative on the question of medical necessity of the two subject pillows during the relevant

9  period.

10          Clearly, the weight of the evidence, particularly the medical opinions of Dr.

11  Rohrer and Dr. Chapnick, supports a finding that plaintiff's medical pillows were not medically

12  necessary.  Nevertheless, construing the evidence in plaintiff's favor, as the court must on

13  summary judgment, a finding of "medical necessity" remains supported by the express terms of

14  Dr. Rohrer's second Comprehensive Accommodation Chrono (CDC Form 7410), as approved by

15  the CMO on November 18, 2009, and as so construed at the Director's Level on February 20,

16  2010.

17          This limited finding of medical necessity does not, however, dictate a further

18  finding that plaintiff's temporary denial of access to his medical pillows constituted a

19  "sufficiently serious deprivation" triggering Eighth Amendment protections.  On the contrary, the

20  court finds that the limited duration of the deprivation, and lack of evidence of resulting harm,

21  fail to sustain plaintiff's Eighth Amendment claim.  Plaintiff had access to neither medical pillow

22  for a period of only twenty-one days;[17] plaintiff received his second medical pillow forty-eight

23  days thereafter, during which he had been prescribed increased pain medications.  Plaintiff

24

25          [17]  While plaintiff testified that he had no pillow for this 21-day period, neither his claims
    against defendant, nor his briefing in opposition to the pending motions, are premised on the
26  alleged deprivation of a regular pillow.

1   testified that his pain began to subside after he was provided with one of his pillows.  (Pltf. Depo.

2   at 76-79.)  The record lacks support for plaintiff's allegations of long-term injury.  While

3   accepting as true plaintiff's allegations of increased pain, discomfort, and difficulty sleeping due

4   to the deprivation of his pillows, it is reasonable to infer that these symptoms were only

5   temporary.  Plaintiff has failed to demonstrate a triable issue of fact whether the deprivation of

6   his pillows caused, or substantially risked, serious harm to plaintiff.

7            For these reasons, the court finds that plaintiff's deprivation was not "sufficiently

8   serious" to trigger Eighth Amendment protections.  Accord Knight v. Evans, 2008 WL 5225863,

9   *5  (N.D. Cal. 2008) (delay in providing medical appliances, including medical-gel mattress,

10  medical-issued pillow, back brace and ankle braces, constituted no more than negligence) (citing

11  cases); see also Johnson, 217 F.3d at 731 (a modest deprivation can support an Eighth

12  Amendment violation only if it is lengthy or ongoing).  "If the harm is an isolated exception to

13  the defendant's overall treatment of the prisoner it ordinarily militates against a finding of

14  deliberate indifference."  Jett, 439 F.3d at 1096.

15            c.  Defendant's Challenged Conduct

16            Even if the record could reasonably be construed to support a finding that

17  plaintiff's temporary deprivation of his medical pillows was a "sufficiently serious deprivation"

18  warranting Eighth Amendment protections, plaintiff has failed to demonstrate that defendant was

19  aware that such deprivation could have posed a significant risk of serious harm to plaintiff, or

20  that defendant was uniquely responsible for remedying such risk.

21            To sustain a federal constitutional claim against a particular defendant, the

22  plaintiff must demonstrate an affirmative link or causal connection between the alleged

23  constitutional violation and the defendant's challenged conduct.  Rizzo v. Goode, 423 U.S. 362,

24  371 (1976); Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978); Leer v. Murphy, 844 F.2d 628,

25  633 (9th Cir. 1988).  In addition, to sustain an Eighth Amendment deliberate indifference claim,

26  the plaintiff must demonstrate that the defendant was both:  (1) aware of a substantial risk of

serious harm to plaintiff, by reason of the alleged deprivation; and (2) had no reasonable

justification for causing, or failing to remedy, the deprivation.  Thomas, supra, 611 F.3d at 1150-

51, and cases cited therein.

The court analyzes defendant's alleged failure to act based on the following time

periods:  (1) defendant's October 8, 2009 confiscation of both pillows;  (2) the one-week period

from October 22, 2009 (when plaintiff showed defendant Dr. Rohrer's first chrono) to October

29, 2009 (when plaintiff obtained his first pillow); and (3) the three-week period from November

25, 2009 (when plaintiff showed defendant Dr. Rohrer's second chrono) to December 16, 2009

(when plaintiff obtained his second pillow).

It is undisputed that, when plaintiff moved to Facility 15 on October 8, 2009, he

had no documentation supporting his possession of the medical pillows.  Therefore, defendant

appropriately relied on departmental rules to confiscate both pillows.  Plaintiff's assertion that it

should have been clear to defendant that the pillows were "health care" or "medical" appliances,

is unavailing.  See CDCR Department Operations Manual ("DOM"), § 54030.10 ("health care

appliances" must be "prescribed by health care staff and subject to approval by designated

custody staff").[18]  Plaintiff's related claim that defendant was intentionally harassing plaintiff,

allegedly demonstrated by including plaintiff's pillows and state-issued blankets in the volume

assessment, is also unavailing.  Absent clear authorization for the pillows as health care

appliances, they were properly included in the volume assessment.  Cf. 15 C.C.R. § 3190(i)(1)

(only "Health Care Appliances [that are] subject to prescription by health care staff and approval

by designated custody staff, shall be excluded from the six cubic foot limitation of section

3190(c).").  Plaintiff's blankets were also appropriately included, despite being state-issued.  See

---

[18]  See also 15 C.C.R. § 3358(b) ("No inmate shall be deprived of a *prescribed* orthopedic or prosthetic appliance in the inmate's possession upon arrival into the department's custody or *properly obtained* while in the department's custody unless a department physician or dentist determines the appliance is no longer needed and the inmate's personal physician, if any, concurs in that opinion.")  (Emphasis added.)

1   D.O.M. § 54030.4 ("The combined volume of state-issued and authorized personal property shall

2   not exceed six cubic feet . . . ."). Moreover, the record demonstrates that plaintiff was ultimately

3   required to forfeit personal property because it exceeded quantity limitations (e.g., number of

4   electrical appliances), not volume limitations.

5          This evidence supports a finding that defendant's confiscation of plaintiff's

6   pillows on October 8, 2009 was reasonably justified because it comported with departmental

7   rules. Moreover, because plaintiff had no authorization for the pillows, there is no basis for

8   inferring that defendant should have been aware that their confiscation could pose a substantial

9   risk of serious harm to plaintiff. For these reasons, the court finds, as a matter of law, that

10   defendant did not violate plaintiff's Eighth Amendment rights by confiscating plaintiff's medical

11   pillows on October 8, 2009.

12          The next relevant date is October 22, 2009, when plaintiff showed defendant Dr.

13   Rohrer's first chrono, which authorized only generally that plaintiff be provided a "pillow."

14   Plaintiff testified that defendant stated he would not release one of plaintiff's pillows because the

15   chrono post-dated the confiscation. It is also reasonable to infer that defendant declined to

16   retrieve one of plaintiff's medical pillows because the chrono did not so specify. A week later,

17   on October 29, 2009, plaintiff obtained one of his pillows through the efforts of Lt. Fecht.

18          Defendant's verified declaration provides that it was his understanding that prison

19   policy required that plaintiff be issued new medical pillows, or that "a high ranking correctional

20   staff member grant him permission to obtain the two medical pillows that were confiscated."

21   (Id.) Defendant's first statement is consistent with department regulations, noted above, that

22   require proper written authorization for an inmate's possession of medical appliances.

23   Defendant's stated deference to higher ranking officials is also consistent with department policy.

24   In fact, higher ranking officials ultimately retrieved both of plaintiff's medical pillows -- Lt.

25   Fecht in October, and Lt. Brida in December. Plaintiff's statement that he asked, without

26   ////

1   success, other custody staff to retrieve his pillows,[19] lends additional support for defendant's

2   alleged deference to higher ranking officials.

3          For these reasons, the court finds no violation of plaintiff's Eighth Amendment

4   rights for the period October 22, 2009, to October 29, 2009.  Because Dr. Rohrer's first chrono

5   failed to specify that plaintiff should be given one of the medical pillows given him by Queen of

6   the Valley Hospital, defendant was reasonably justified in denying plaintiff's request.  Moreover,

7   absent specific authorization for retrieving one of plaintiff's pillows, pursuant to the subject

8   chrono or as directed by higher ranking staff, there is no basis for finding that defendant should

9   have discerned any risk of harm to plaintiff by failing to do so.

10          The last relevant period for assessing plaintiff's Eighth Amendment claim is the

11   three-week period from November 25, 2009 (when plaintiff showed defendant Dr. Rohrer's

12   second chrono), and December 16, 2009 (when plaintiff obtained the second pillow through the

13   efforts of Lt. Brida).  Dr. Rohrer's second chrono specifically authorized plaintiff's possession of

14   both medical pillows given him by Queen of the Valley Hospital, that is, both pillows confiscated

15   by defendant on October 8, 2009.

16          In addition to the reasons set forth above, defendant emphasizes that he was not

17   uniquely authorized to retrieve plaintiff's pillows.  Defendant states that he never had sole

18   custody or control of the pillows, particularly after they were placed in storage.  (Dkt. No. 43 at

19   3.)  The record contains no evidence to refute these statements.  Moreover, even assuming that

20   defendant had some affirmative duty to retrieve plaintiff's second pillow, plaintiff has alleged no

21   facts upon which to reasonably infer that defendant knew that his failure to do so could result in a

22   substantial risk of serious harm to plaintiff.  On the contrary, when plaintiff showed defendant

23

24          [19]  Plaintiff states, in his sworn opposition, that he "did try to obtain the 2 pillows from
     other custody staff and was told that he was not going to get involved.  It was C/O Sable.
25   Plaintiff also went to Lt. Fecht about the defendant taking plaintiff's 2 pillows."  (Oppo., Dkt.
     No. 49 at 3.)  Plaintiff asserts that this demonstrates he "did in fact try to obtain the pillows from
26   other custody staff."  (Id.)

1  Dr. Rohrer's second chrono, plaintiff had been using one of his medical pillows for a period of

2  twenty-seven days, and had been taking increased pain medication for a period of two weeks.

3  These facts countermine any inference that defendant's alleged refusal to provide plaintiff with

4  his second pillow created an "obvious" or reasonably inferred risk of substantial harm to

5  plaintiff, much less that defendant ignored such risk.

6         For these reasons, the court finds no violation of plaintiff's Eighth Amendment

7  rights for the period November 25, 2009, to December 16, 2009.  Although Dr. Rohrer's second

8  chrono was explicit in specifying that plaintiff should be given the second of his medical pillows

9  issued by Queen of the Valley Hospital, the record fails to support a finding that defendant was

10  required to execute the chrono on his own, without authorization or direction from a higher

11  ranking staff member, or that defendant knew that his failure to personally execute the chrono

12  could cause a significant risk of serious harm to plaintiff.  In light of all these circumstances, the

13  court finds that defendant's failure to respond to plaintiff's second chrono was both reasonable

14  and justified.  Farmer, supra, 511 U.S. at 844-45.

15         For these several reasons, the court finds that summary judgment should be

16  granted for defendant on plaintiff's Eighth Amendment claim.

17         3. Qualified Immunity

18         Defendant contends, alternatively, that he is entitled to qualified immunity on

19  plaintiff's Eighth Amendment claim.  The first prerequisite for considering a defense of qualified

20  immunity is a determination, based on the facts alleged and viewed in the light most favorable to

21  plaintiff, whether defendant violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201

22  (2001). Where the facts do not state a claim for violation of a constitutional right, the court need

23  make no further inquiry.  Id.

24         Pursuant to the court's finding that plaintiff has failed to sustain the merits of his

25  Eighth Amendment claim against defendant, the court need not reach defendant's alternative

26  contention that he is entitled to qualified immunity.

C. <u>First Amendment Retaliation Claim</u>

Plaintiff claims that defendant "confiscated Plaintiff's pillows out of reprisal because of Plaintiff's exercise of Plaintiff's protected speech, in the forms of filing appeals on defendant . . . in violation of Plaintiff's First Amendment Rights." (Cmplt., Dkt. No. 1 at 8.) Stated differently, plaintiff claims that defendant violated his right to be "free to express himself, free to report misconduct when detected, free from harassment and retaliation for reporting wrongdoing when detected and free to file grievances." (Id. at 12.) Plaintiff also alleges that "[t]he arbitrary and capricious actions of defendant . . . chilled the effect and exercise of Plaintiff's First Amendment Rights. The actions of defendant [] did not serve any penological goal, nor were his actions tailored narrowly enough to achieve such goals. Instead, the actions of defendant [] were based on animus." (Id.) More generally, plaintiff alleges that defendant confiscated his pillows "for harassment and retaliation purposes." (Id. at 9; see also id. at 11.) In his opposition briefs, plaintiff emphasizes that his retaliation claim is largely based on defendant's confiscation of plaintiff's pillows on October 8, 2009, allegedly in retaliation for plaintiff's threats to file an inmate appeal challenging defendant's allegedly harassing directive that plaintiff include his blankets in the volume assessment.

Defendant seeks summary judgment on this claim, primarily on the ground that plaintiff has failed to demonstrate any direct link between defendant's confiscation of plaintiff's pillows, and plaintiff's subsequently-filed inmate grievances. The court recommends summary judgment for defendant on this claim.

1. <u>Legal Standards</u>

To prevail on a claim for retaliation under the First Amendment, plaintiff must demonstrate that, on a specified date, an individual state actor took adverse action against plaintiff in retaliation for plaintiff's engagement in a constitutionally protected activity, and that the adverse action did not reasonably advance a legitimate penological goal. Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005); Rizzo v. Dawson, 778 F.2d 527, 531-32 (9th

1    Cir. 1985).  Plaintiff's evidence must establish a link between the challenged conduct and

2    defendant's allegedly retaliatory motive.  Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995).

3    Direct and tangible harm will support a First Amendment retaliation claim even without

4    demonstrating a chilling effect on the further exercise of a prisoner's First Amendment rights.

5    Rhodes, at 408 F.3d at 568 n.11.

6            2.  Analysis

7            Plaintiff misapprehends the nature of a First Amendment retaliation claim.

8    Defendant contends, correctly, that the only two relevant inmate appeals filed by plaintiff were

9    commenced after defendant confiscated plaintiff's pillows, thus demonstrating that defendant

10   could not have been motivated at that time by retaliation against plaintiff for filing inmate

11   appeals.  In addition, the court has found no authority for finding an inmate's threat to file an

12   appeal "constitutionally protected conduct."  Similarly, plaintiff has not alleged any specific

13   causal connection between his filing of the appeals and defendant's subsequent refusal to release

14   the pillows.  Finally, even if plaintiff could demonstrate the first three elements of his retaliation

15   claim against defendant -- adverse action in retaliation for a constitutionally protected activity --

16   plaintiff cannot support the fourth element.  The court finds that defendant's challenged conduct

17   was both reasonable and justified by prison policy, thereby supporting the further finding that

18   defendant's conduct served a legitimate penological purpose.

19           Accordingly, the court finds that summary judgment should be granted for

20   defendant on plaintiff's First Amendment claim.

21   V.  CONCLUSION

22           For the foregoing reasons, IT IS HEREBY RECOMMENDED that defendant's

23   motion for summary judgment (Dkt. No. 40), be granted in its entirety in favor of defendant.

24           These amended findings and recommendations are submitted to the United States

25   District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within

26   14 days after being served with these findings and recommendations, any party may file written

1   objections with the court and serve a copy on all parties.  Such a document should be captioned

2   "Objections to Magistrate Judge's Amended Findings and Recommendations."  Any response to

3   the objections shall be filed and served within 14 days after service of the objections.  The parties

4   are advised that failure to file objections within the specified time may waive the right to appeal

5   the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

6   DATED:  March 13, 2013

7

8                                                    _____

9                                                    KENDALL J. NEWMAN
                                                     UNITED STATES MAGISTRATE JUDGE

10   chris1786.msj.amd

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26